UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | | |
|---|---|---|
| CULLEN ROSEN, Derivatively on Behalf of CENTURYLINK, INC., | ) ) ) | Civil Action No. |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| GLEN F. POST, III, KAREN A. PUCKETT, R. STEWART EWING, JR., JOSEPH R. ZIMMEL, C. G. MELVILLE, JR., WILLIAM A. OWENS, RICHARD A. GEPHARDT, FRED R. NICHOLS, HARVEY P. PERRY, W. BRUCE HANKS, PETER C. BROWN, MICHAEL J. ROBERTS, VIRGINIA BOULET, GREGORY J. MCCRAY, and LAURIE A. SIEGEL, | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) ) | |
| -and- | ) ) | |
| CENTURYLINK, INC., a Louisiana corporation, | ) ) ) | |
| Nominal Defendant. | ) ) | |
| | ) | **JURY TRIAL DEMANDED** |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
FOR BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE
ASSETS AND UNJUST ENRICHMENT**

**SUMMARY OF ACTION**

1.      This is a shareholder derivative action brought by plaintiff on behalf of nominal

defendant CenturyLink, Inc. ("CenturyLink" or the "Company") against certain of its officers

and directors for breaches of fiduciary duty, waste of corporate assets, and unjust enrichment.

These wrongs resulted in hundreds of millions of dollars in damages to CenturyLink's reputation,

goodwill, and standing in the business community.  Moreover, these actions have exposed the

Company to hundreds of millions of dollars in potential liability for violations of state and federal law.

2.     CenturyLink is the third-largest telecommunications company in the United States.  The Company was once considered a "dividend champion," achieving over thirty-seven consecutive years of annual dividend increases.  In 2011, the Company stopped increasing its annual dividend, holding at a healthy $0.725 per share per quarter.  When the halt to the historic increase was announced, many concerned investors took this dividend freeze as a warning and began selling their shares.  In an attempt to assuage investor fears, certain Individual Defendants (as defined herein) began issuing improper public statements on behalf of the Company.  In particular, through December 2012, certain Individual Defendants repeatedly assured the market that: (i) the Company had enough free cash flow to continue paying both dividends and the Company's debt; and (ii) the 2013 dividend would either stay the same, or would slightly increase.

3.     On February 13, 2013, CenturyLink shocked the market when the Company issued a press release disclosing that the CenturyLink Board of Directors (the "Board") intended to slash the Company's quarterly dividend rate to $0.54 per share, from $0.725 per share.  The press release further revealed that this staggering 25% dividend reduction would be used to pay off debt and to facilitate the Company's repurchase of up to $2 billion of its outstanding common stock.

4.     In the wake of this disclosure, CenturyLink's stock plunged more than 22%, or $9.42 per share on February 14, 2013, to close at $32.27 compared to the previous trading day's closing of $41.69.  This was the Company's largest one-day stock drop in over thirty-three years, erasing more than *$6.8 billion* in market capitalization overnight.  Further, as a direct result of

this unlawful course of conduct, the Company is now the subject of at least two federal securities class action lawsuits filed in the United States District Court for the Southern District of New York on behalf of investors who purchased CenturyLink's shares.

5.      The Individual Defendants, however, fared much better than the Company or its shareholders.  In particular, while causing or allowing CenturyLink to make improper statements that artificially inflated the Company's stock price, certain Individual Defendants (including six members of the Board) sold 174,519 of their personally held shares for proceeds of more than $7.4 million.

6.      Plaintiff brings this action against the Individual Defendants to repair the harm that they caused the Company and seeks disgorgement to the Company of unlawful insider trading proceeds.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction under 28 U.S.C. §1332 because plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.  This action is not a collusive action designed to confer jurisdiction on the court of the United States that it would not otherwise have.

8.      This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice.

9.      Venue is proper in this Court in accordance with 28 U.S.C. section 1391(a) because: (i) CenturyLink maintains its principal place of business in this District; (ii) one or

more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to CenturyLink, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

10.    Plaintiff Cullen Rosen was a shareholder of CenturyLink at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current CenturyLink shareholder.  Plaintiff is a citizen of Virginia.

**Nominal Defendant**

11.    Nominal Defendant CenturyLink is a Louisiana corporation with principal executive offices located at 100 CenturyLink Drive, Monroe, Louisiana.  CenturyLink is an integrated communications company engaged primarily in providing an array of communications services to residential, business, governmental, and wholesale customers.   CenturyLink's communications services include local and long-distance, network access, private line (including special access), public access, broadband, data, managed hosting (including cloud hosting), colocation, wireless, and video services.

**Defendants**

12.    Defendant Glen F. Post, III ("Post") is CenturyLink's Chief Executive Officer ("CEO") and has been since 1992, President and has been since July 2009, and a director and has been since 1985.  Defendant Post was also CenturyLink's Chairman of the Board from 2002 to

2009; Vice Chairman of the Board from 1993 to 2002; President from 1990 to 2002; Chief

Operating Officer ("COO") from 1988 to 1992; an Executive Vice President from 1988 to 1990;

Senior Vice President from 1984 to 1988; Chief Financial Officer ("CFO") from 1986 to 1988;

Treasurer from 1984 to 1986; and a Vice President from 1982 to 1984.  Defendant Post began

working for CenturyLink in 1976.  Defendant Post is named as a defendant in securities class

action complaints that allege he violated sections 10(b) and 20(a) of the Securities Exchange Act

of 1934 (the "Exchange Act").  Defendant Post knowingly, recklessly, or with gross negligence

made improper statements in the Company's press releases and public filings concerning the

Company's: (i) free cash flow availability and intended allocation; and (ii) the Board's decision to

slash CenturyLink's dividend in order to pay off Company debt and commence a stock

repurchase.  While in possession of material, non-public information concerning CenturyLink's

true business health, defendant Post sold 100,000 shares of his stock for $4,305,470 in proceeds.

CenturyLink paid defendant Post the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value | All Other Compensation | Total |
|------|--------|--------------|----------------------------------------|-------------------------|------------------------|-------|
| 2012 | $1,047,606 | $5,157,049 | $1,767,836 | $649,156 | $103,392 | $8,725,039 |

Defendant Post is a citizen of Louisiana.

13.     Defendant Karen A. Puckett ("Puckett") is CenturyLink's COO and has been since

2000, and an Executive Vice President and has been since 2009.  Defendant Puckett was also a

CenturyLink President from 2002 to 2009 and an Executive Vice President from 2000 to 2002.

Defendant Puckett knowingly, recklessly, or with gross negligence made improper statements in

the Company's press releases and public filings concerning the Company's: (i) free cash flow

availability and intended allocation; and (ii) the Board's decision to slash CenturyLink's dividend

in order to pay off Company debt and commence a stock repurchase.  While in possession of

material, non-public information concerning CenturyLink's true business health, defendant

Puckett sold 50,000 shares of her stock for $2,153,655 in proceeds.  CenturyLink paid defendant

Puckett the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value | All Other Compensation | Total |
|------|--------|--------------|----------------------------------------|-------------------------|------------------------|-------|
| 2012 | $684,562 | $2,250,332 | $1,015,837 | $411,822 | $42,838 | $4,405,391 |

Defendant Puckett is a citizen of Louisiana.

14.     Defendant R. Stewart Ewing, Jr. ("Ewing") is CenturyLink's CFO and has been

since 1989, an Executive Vice President and has been since 1999, and Assistant Secretary and

has been since 2009.  Defendant Ewing was also a CenturyLink Senior Vice President from 1989

to 1999, Vice President and Controller from 1984 to 1989, and Vice President of Finance from

1983 to 1984.  Defendant Ewing is named as a defendant in securities class action complaints

that allege he violated sections 10(b) and 20(a) of the Exchange Act.   Defendant Ewing

knowingly, recklessly, or with gross negligence made improper statements in the Company's

press releases and public filings concerning the Company's: (i) free cash flow availability and

intended allocation; and (ii) the Board's decision to slash CenturyLink's dividend in order to pay

off Company debt and commence a stock repurchase.  CenturyLink paid defendant Ewing the

following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value | All Other Compensation | Total |
|------|--------|--------------|----------------------------------------|-------------------------|------------------------|-------|
| 2012 | $616,105 | $1,744,036 | $914,696 | $415,853 | $38,595 | $3,729,285 |

Defendant Ewing is a citizen of Louisiana.

15.     Defendant Joseph R. Zimmel ("Zimmel") is a CenturyLink director and has been

since 2003.  Defendant Zimmel is also a member of CenturyLink's Audit Committee and has

been since at least April 2012.  Defendant Zimmel knowingly or recklessly made improper

statements in the Company's press releases and public filings concerning the Company's: (i) free cash flow availability and intended allocation; and (ii) the Board's decision to slash CenturyLink's dividend in order to pay off Company debt and commence a stock repurchase. While in possession of material, non-public information concerning CenturyLink's true business health, defendant Zimmel sold 10,938 shares of his stock for $427,181.40 in proceeds. CenturyLink paid defendant Zimmel the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2012 | $106,250 | $114,784 | $221,034 |

Defendant Zimmel is a citizen of Connecticut.

16.    Defendant C. G. Melville, Jr. ("Melville") is a CenturyLink director and has been since 1968.  Defendant Melville knowingly or recklessly made improper statements in the Company's press releases and public filings concerning the Company's: (i) free cash flow availability and intended allocation; and (ii) the Board's decision to slash CenturyLink's dividend in order to pay off Company debt and commence a stock repurchase.  While in possession of material, non-public information concerning CenturyLink's true business health, defendant Melville sold 5,501 shares of his stock for $227,518.18 in proceeds.  CenturyLink paid defendant Melville the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2012 | $110,625 | $114,784 | $225,409 |

Defendant Melville is a citizen of Louisiana.

17.    Defendant William A. Owens ("Owens") is CenturyLink's Non-Executive Chairman of the Board and a director and has been since July 2009.  Defendant Owens knowingly or recklessly made improper statements in the Company's press releases and public filings concerning the Company's: (i) free cash flow availability and intended allocation; and (ii)

the Board's decision to slash CenturyLink's dividend in order to pay off Company debt and commence a stock repurchase.   While in possession of material, non-public information concerning CenturyLink's true business health, defendant Owens sold 5,000 shares of his stock for $191,215 in proceeds.  CenturyLink paid defendant Owens the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2012 | $102,750 | $314,438 | $417,188 |

Defendant Owens is a citizen of Washington.

18.     Defendant Richard A. Gephardt ("Gephardt") is a CenturyLink director and has been since July 2009.  Defendant Gephardt knowingly or recklessly made improper statements in the Company's press releases and public filings concerning the Company's: (i) free cash flow availability and intended allocation; and (ii) the Board's decision to slash CenturyLink's dividend in order to pay off Company debt and commence a stock repurchase.   While in possession of material, non-public information concerning CenturyLink's true business health, defendant Gephardt sold 1,780 shares of his stock for $67,360.54 in proceeds.  CenturyLink paid defendant Gephardt the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2012 | $79,250 | $114,784 | $279,398 | $473,432 |

Defendant Gephardt is a citizen of Florida.

19.     Defendant Fred R. Nichols ("Nichols") is a CenturyLink director and has been since 2003.   Defendant Nichols knowingly or recklessly made improper statements in the Company's press releases and public filings concerning the Company's: (i) free cash flow availability and intended allocation; and (ii) the Board's decision to slash CenturyLink's dividend in order to pay off Company debt and commence a stock repurchase.  While in possession of

material, non-public information concerning CenturyLink's true business health, defendant Nichols sold 1,300 shares of his stock for $50,716.90 in proceeds.  CenturyLink paid defendant Nichols the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2012 | $102,750 | $114,784 | $3,692 | $221,226 |

Defendant Nichols is a citizen of Texas.

20.     Defendant Harvey P. Perry ("Perry") is CenturyLink's Non-Executive Vice Chairman of the Board and has been since 2004 and a director and has been since 1990. Defendant Perry retired from CenturyLink in 2003 after holding various positions at the Company from 1984 including, Secretary and General Counsel, and Executive Vice President and Chief Administrative Officer.  Defendant Perry knowingly or recklessly made improper statements in the Company's press releases and public filings concerning the Company's: (i) free cash flow availability and intended allocation; and (ii) the Board's decision to slash CenturyLink's dividend in order to pay off Company debt and commence a stock repurchase. CenturyLink paid defendant Perry the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2012 | $195,250 | $114,784 | $8,276 | $318,310 |

Defendant Perry is a citizen of Louisiana.

21.     Defendant W. Bruce Hanks ("Hanks") is a CenturyLink director and has been since 1992. Defendant Hanks left CenturyLink in March 2001 after holding various positions at the Company from August 1980 including, COO, Senior Vice President – Corporate Development and Strategy, CFO, Senior vice President – Revenues and External Affairs, and President – Telecommunications Services.  Defendant Hanks is Chairman of CenturyLink's Audit Committee and has been since at least April 2012.  Defendant Hanks knowingly or

recklessly made improper statements in the Company's press releases and public filings concerning the Company's: (i) free cash flow availability and intended allocation; and (ii) the Board's decision to slash CenturyLink's dividend in order to pay off Company debt and commence a stock repurchase.  CenturyLink paid defendant Hanks the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2012 | $137,500 | $114,784 | $5,182 | $257,466 |

Defendant Hanks is a citizen of Louisiana.

22.    Defendant Peter C. Brown ("Brown") is a CenturyLink director and has been since July 2009.  Defendant Brown is also a member of CenturyLink's Audit Committee and has been since at least April 2012.  Defendant Brown knowingly or recklessly made improper statements in the Company's press releases and public filings concerning the Company's: (i) free cash flow availability and intended allocation; and (ii) the Board's decision to slash CenturyLink's dividend in order to pay off Company debt and commence a stock repurchase. CenturyLink paid defendant Brown the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2012 | $112,250 | $114,784 | $227,034 |

Defendant Brown is a citizen of Missouri.

23.    Defendant Michael J. Roberts ("Roberts") is a CenturyLink director and has been since April 2011.  Defendant Roberts is also a member of CenturyLink's Audit Committee and has been since at least April 2012.  Defendant Roberts knowingly or recklessly made improper statements in the Company's press releases and public filings concerning the Company's: (i) free cash flow availability and intended allocation; and (ii) the Board's decision to slash

CenturyLink's dividend in order to pay off Company debt and commence a stock repurchase. CenturyLink paid defendant Roberts the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2012 | $97,250 | $114,784 | $212,034 |

Defendant Roberts is a citizen of Illinois.

24.   Defendant Virginia Boulet ("Boulet") is a CenturyLink director and has been since 1995.  Defendant Boulet knowingly or recklessly made improper statements in the Company's press releases and public filings concerning the Company's: (i) free cash flow availability and intended allocation; and (ii) the Board's decision to slash CenturyLink's dividend in order to pay off Company debt and commence a stock repurchase.  CenturyLink paid defendant Boulet the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2012 | $116,500 | $114,784 | $231,284 |

Defendant Boulet is a citizen of Louisiana.

25.   Defendant Gregory J. McCray ("McCray") is a CenturyLink director and has been since 2005.  Defendant McCray knowingly or recklessly made improper statements in the Company's press releases and public filings concerning the Company's: (i) free cash flow availability and intended allocation; and (ii) the Board's decision to slash CenturyLink's dividend in order to pay off Company debt and commence a stock repurchase.  CenturyLink paid defendant McCray the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2012 | $98,750 | $114,784 | $213,534 |

Defendant McCray is a citizen of Illinois.

26.     Defendant Laurie A. Siegel ("Siegel") is a CenturyLink director and has been since July 2009.  Defendant Siegel knowingly or recklessly made improper statements in the Company's press releases and public filings concerning the Company's: (i) free cash flow availability and intended allocation; and (ii) the Board's decision to slash CenturyLink's dividend in order to pay off Company debt and commence a stock repurchase.  CenturyLink paid defendant Siegel the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2012 | $113,813 | $114,784 | $228,597 |

Defendant Siegel is a citizen of New Jersey.

27.     The defendants identified in ¶¶12-14 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶12, 15-26 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶15, 21-24 are referred to herein as the "Audit Committee Defendants."  The defendants identified in ¶¶12-13, 15-19 are referred to herein as the "Insider Selling Defendants."  Collectively, the defendants identified in ¶¶12-26 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

28.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe CenturyLink and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage CenturyLink in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of CenturyLink and not in furtherance of their personal interest or benefit.

29.     To discharge their duties, the officers and directors of CenturyLink were required

to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of CenturyLink were required to, among other things:

(a)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial health;

(b)     ensure that the Company complied with its legal obligations and requirements, including complying with regulatory requirements and disseminating truthful and accurate statements to the investing public;

(c)     conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)     remain informed as to how CenturyLink conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

(e)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

30.     Each officer and director of the Company owes to CenturyLink and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company,

the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

**Breaches of Duties**

31.    The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of CenturyLink, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

32.    The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the dissemination of U.S. Securities and Exchange Commission ("SEC") filings and public statements which they knew or were reckless in not knowing contained improper statements and omissions, including with respect to the Company's financial controls, business prospects, and dividend payments.

33.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of CenturyLink, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, CenturyLink has expended, and will continue to expend, significant sums of money.

**Additional Duties of the Audit Committee Defendants**

34.     In addition to these duties, under the Audit Committee Charter in effect since at least November 2010, as amended on November 13, 2012, the Audit Committee Defendants, defendants Brown, Hanks, Roberts, and Zimmel owed specific duties to CenturyLink to assist the Board in fulfilling its oversight responsibilities.  In particular, among other things, the Audit Committee was required to: (i) oversee the Company's system of financial reporting, auditing, controls and legal compliance; (ii) monitor the operation of such systems; and (iii) monitor the integrity of the Company's financial statements and related disclosures.

35.     Despite these additional duties, Audit Committee Defendants, Brown, Hanks, Roberts, and Zimmel, wholly abdicated their responsibilities to the Company and its shareholders by allowing the Company to issue improper statements, failing to ensure that reliable systems of controls were implemented and functioning effectively to prevent the Company from issuing improper statements, and failing to ensure the Company's compliance with applicable laws and regulations.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

36.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

37.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including   shareholders   of   CenturyLink,   regarding   the   Individual   Defendants'

management of CenturyLink's operations and the Company's intention to slash dividends to pay off the Company's debt and engage in a massive stock repurchase; (ii) facilitate defendants Post, Puckett, Zimmel, Melville, Owens, Nichols, and Gephardt's illicit sale of over $7.4 million worth of  their personally held shares while in possession of material, non-public information; and (iii) enhance the Individual Defendants' executive and directorial positions at CenturyLink and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.   In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

38.    The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to issue improper financial statements and guidance.

39.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

40.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

41.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the

commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## FACTUAL BACKGROUND

42.     CenturyLink is an integrated communications company engaged primarily in providing various communications services to residential, business, governmental, and wholesale customers.  CenturyLink's communications services include local and long-distance phone access, network access, broadband and wireless internet, and various other communications services.

43.     A substantial portion of the Company's business is derived from individual "land lines," a business sector that, while currently extremely lucrative, is slowly becoming less and less profitable as consumers migrate towards cellular and other wireless technology. Nonetheless, CenturyLink's stock price has remained relatively stable over the last several years, in large part due to the Company's consistent, historic distribution of healthy quarterly dividends.

## CENTURYLINK INSIDERS DUMP THEIR STOCK WHILE MAKING IMPROPER STATEMENTS ABOUT THE COMPANY'S FUTURE DIVIDEND PAYMENT PLANS

44.     As noted in the Company's Annual Reports, CenturyLink's ability to pay dividends is highly dependent on its access to free cash flow.  Further, decisions concerning whether, when, and in what amounts to make dividend distributions are entirely at the discretion of the Board.  As a result, and as the defendants admit, the Board closely monitors the Company's free cash flow and debt obligations, especially when preparing annual budgets and determining dividend payout amounts.

45.    During the second half of 2012, as the Board was evaluating free cash flow and determining whether to continue the Company's historic dividend payouts, it became evident that reduction of Company debt had taken a higher priority than paying substantial dividends. Nonetheless, the Board caused or allowed certain Individual Defendants to repeatedly promise to shareholders that the Company would maintain or even increase its dividend level.  As detailed below, however, these statements were improper because the Individual Defendants were well aware that the Company was planning to drastically slash 2013 dividends in order repay certain debts and initiate a multi-billion dollar share repurchase.

46.    On August 8, 2012, CenturyLink issued its second quarter 2012 earnings press release touting the Company's purported strong cash flow generation of $779 million which, in part, was historically used by the Company to pay hefty dividends to its shareholders.  The press release stated in relevant part:

**Achieved operating revenues of $4.61 billion, exceeding guidance.**

**Improved annual rate of revenue decline to 1.2% in second quarter 2012 compared to 3.8% and 2.7% annual declines in pro forma second quarter 2011 and first quarter 2012, respectively.**

**Achieved Adjusted Diluted EPS1, 2 of $0.65 compared to $0.69 in pro forma second quarter 201.1.**

**Generated Free Cash Flow of $779 million, excluding special items**

CenturyLink, Inc. (NYSE: CTL) today reported strong operating revenues, operating cash flow and free cash flow for second quarter 2012.

*"CenturyLink continued to generate solid results in the second quarter, maintaining our top-line revenue trend improvement and strong cashflow generation"* said Glen F. Post, III. chief executive officer and president. "We successfully completed our operating group restructuring during the second quarter without disrupting the positive sales momentum across our business and believe that CenturyLink is even better positioned to serve our enterprise customers across the United States and internationally."

"We experienced continued broadband and Prism™ TV subscriber growth in the second quarter, in spite of typical lower seasonal demand, while continuing to improve customer retention as our annual access line loss rate of decline slowed to 6.1% this quarter from 7.4% in the pro forma year-ago period. We generated 5.8% sequential and 7.9% year-over-year growth in colocation and managed hosting revenues and grew strategic data revenues across our Regional Markets Group (RMG) and Enterprise Markets Group (EMG)."

"As we enter the second half of 2012, we remain focused on investing in broadband expansion and enhancement. Prism™ TV, fiber-to-the-tower and managed hosting and cloud computing services in order to maximize the opportunities for future revenue growth," said Post.

47.     The same day, the Company conducted an earnings conference call with analysts and investors. During the call, defendants Post and Ewing boasted about CenturyLink's strong cash flows which would purportedly drive long-term shareholder value and allow the Company to return "meaningful cash" to its shareholders.  Defendant Post further acknowledged that the Board would meet to discuss 2013 projections no later than September 2012.  Defendant Ewing stated in relevant part:

> [Ewing]: *As you can see, we generated strong operating revenues and solid cash flows.* Operating revenues were $4.6 billion on a consolidated basis exceeding our guidance for the quarter and represent a 1.2% decline from pro forma second quarter 2011 operating revenues.
>
> *   *   *
>
> *We generated solid operating cash flow* of approximately $1.9 billion for the second quarter and achieved an operating cash flow margin of 41.2%. Additionally, we generated $779 million of free cash flow during the quarter which is defined as operating cash flow less cash taxes paid, interest, cash interest as well as capital expenditures and an additional adjustments to other income.
>
> *Our strong cash flows continue to provide us the financial strength and flexibility to meet the business objectives and drive long-term shareholder value.* As a result, our operating group restructured [sic] that Glen discussed earlier, the segment financial information has been realigned this quarter to support this new operating structure.
>
> *   *   *

For the third quarter of 2012, CenturyLink projects total operating revenues of $4.54 billion to $4.59 billion and operating cash flow between $1.82 billion and $1.86 billion.   Adjusted diluted EPS is expected to be $0.54 to $0.59. ***The company expects fourth quarter 2012 operating revenues and operating cash flow to increase compared to third quarter 2012 due to anticipated continued growth in strategic revenues and lower outside plant maintenance and utility marketing cost.***

Slide 19 reflects our full-year 2012 guidance. Our operating revenue we expect it to be $18.3 billion to $18.4 billion, which is consistent with the guidance that we gave last quarter or actually, it's up a $100 million on the lower end. Our operating cash flow from $7.5 billion to $7.65 billion, adjusted diluted EPS from $2.45 to $2.55, capital expenditures from $2.7 billion to $2.8 billion and free cash flow from $3.25 billion to $3.4 billion. In essence, we've tightened our ranges and increased the midpoints of our guidance by moving the bottom of our ranges up to reflect our year-to-date performance.

Turning to Slide 20, in summary, we're investing to drive growth in our strategic initiatives that we believe will result in continued improvement of our top line revenue trend. ***We continue to believe a solid balance sheet is important to our financial flexibility and feel confident about our cash flow generating ability which allows CenturyLink to return meaningful cash to our shareholders.***

\* \* \*

***Expect to be able to give them our 2013 projections probably sometime after we meet with our Board in September***. So and again, I think they want to be able to see that we see clearly that we can get down to 3 times leverage on their basis in order to remove the negative outlook.

With Fitch, the dividend payout ratio is more of what they look at and it's about 55%, which is in line with where we are.

48.     On August 9, 2012, the Company filed a Quarterly Report on Form 10-Q for the second quarter of 2012 ended June 30, 2012, with the SEC.  The Form 10-Q stated that historical and continuing cash flow at CenturyLink would enable the Company to meet current obligations, fund capital expenditures, and continue paying dividends to its shareholders.  The Form 10-Q stated in relevant part:

We have generally relied on cash provided by operations and our revolving credit facility to fund our operating and capital expenditures, make our dividend payments and repay a portion of our maturing debt. ***Our operations have***

*historically provided a stable source of cash flow that has helped us meet the needs of the business.*

\* \* \*

*We anticipate that our existing cash balances and net cash provided by operating activities will enable us to meet our other current obligations, fund capital expenditures and pay dividends to our shareholders.* We also may draw on our revolving credit facility as a source of liquidity if and when necessary.

*We currently expect to continue our current annual dividend of $2.90 per common share,* subject to our board's discretion.

49.     Over the next two days, as the Company's stock price continued to trade at artificially inflated prices due to the Individual Defendants' misleading statements concerning the expected future of the dividend payouts, defendants Post, Puckett, and Melville dumped more than 150,000 of their personally held shares for proceeds of almost $6.5 million.  In particular, on August 9, 2012, defendant Post sold 100,000 shares for proceeds of more than $4.3 million and defendant Puckett sold 50,000 shares for proceeds of over $2.1 million.  The following day, defendant Melville sold 600 shares for proceeds of $25,440.

50.     On August 14, 2012, the Company participated in the Oppenheimer Technology, Internet, and Communications Conference with analysts and investors.  During the conference call, defendant Ewing claimed that even after paying dividends, the Company had enough cash to pay off its debt that was coming due over the next two years.  Defendant Ewing stated in relevant part:

> [Analyst]: And so looking at the free cash flow after the dividend, it seems like you have enough cash to pay off the debt coming due per year the two next years or so, roughly, Is that how you were kind of thinking when you structured it?
>
> [Ewing]: Yeah, so basically I mean, we were trying to structure our maturity so that we felt like we could take care of those maturities with a year of free cash flow.

51.     The following day, defendant Melville dumped another 3,001 shares for proceeds of almost $128,000.

52.     On August 21, 2012, CenturyLink issued a press release announcing that the Company's Board voted to declare a quarterly cash dividend of $0.725 per share.

53.     On September 13, 2012, the Company participated in the Bank of America Merrill Lynch Media, Communications and Entertainment Conference with investors and analysts.  During the conference call, a participant noted to defendant Ewing that CenturyLink had historically stated that the Company did not intend to make changes to the dividend.  In response, defendant Ewing stated that the Company was considering a small *increase in the dividend for 2013, and that a repurchase could provide leeway to increase the dividend*. Defendant Ewing further hinted that the Company might announce a dividend increase in February 2013.  Defendant Ewing stated in relevant part:

> [Unverified Participant]: So are you going to buy Verizon? Okay, so I think I get that. So kind of shifting gears a little bit, so just because you are the CFO, I think that you guys have made it clear that like investing the business as job number one, like looking or being opportunistic with respect to reasonable M&A maybe number two. I think that *historically, you guys have said that significant changes in the dividend are really not in your future*, that if you are going to return capital to shareholders after you delivered to appropriate degree, buybacks are really the way to do that.

> I guess my question is, to you is, *guys like AT&T and Verizon have kind of gone a lot of credit before raising the divided a 0.5% a quarter or a couple percent a year*, nothing significant, but it kind of makes them – it sends two signals. Number one, it says we are an income stream that grows. And number two, it says we are very confident in the long-term future of our business. *Does that signaling resonate with you, do you see a value in that message that you could sent to investors?*

> [Ewing]: *It does and as we look at 2013, we'll review our plans with our board and determine what to do with free cash flow in 2013, but I would say that a small increase in the dividend wouldn't be off the table that that would be something we consider* and I think about and it's a – we understand and have had more communication from shareholders. *I guess in the last six months, it seemed to be moving and drifting toward the dividend increase model from the*

*standpoint of driving potentially more value for shareholders that way.* That being said, I mean, we're still pre-disposed from about to the – above of our stock and *frankly, if we were to repurchase some of our shares, it actually helps us provide a little leeway per dividend increase potentially*.

[Unverified Participant]: And that's a good point. So I guess presumably this is kind of a 2013 thought process, is it, I mean we've got a history right, Verizon announces new things in the third quarter, AT&T announces thing in December. I guess I don't remember really the last time you guys made a big change.

[Ewing]: Yeah.

[Unverified Participant]: But when is the typical for CenturyLink to come out and talk to people about these sorts of things.

Ewing]: Yeah.

[Unverified Participant]: Is it end of the year, beginning of the new year?

[Ewing]: So in the past, I guess, *before we significantly increased our dividend in 2007, we had increased our dividend slightly in each of the 34 years prior to that. Typically, we did that in February.*

54.     On November 7, 2012, CenturyLink issued its third quarter 2012 earnings press release touting that the Company had achieved operating revenues of $4.57 billion, in line with guidance, and had improved year-over-year rate of revenue decline and generated free cash flow of $905 million, excluding special items.  The press release stated in relevant part:

CenturyLink, Inc. (NYSE: CTL) today reported strong operating revenues, operating cash flow and free cash flow for third quarter 2012.

*   *   *

"We are pleased with the continued progress we made during the third quarter toward stabilizing top-line revenue and we believe our continued investment in our key strategic opportunities will help drive enhanced shareholder value," Post said.

### Third Quarter Highlights

- Improved year-over-year actual-to-pro forma revenue trend to a 1.3% rate of decline (1.4% rate of decline excluding data integration revenue), compared to a 4.6% decline in pro forma third quarter 2011.

- *Achieved free cash flow of $905 million*, excluding special items and integration related capital expenditures.

55.     Also on November 7, 2012, during the earnings conference call to investors and analysts, defendants Post and Ewing boasted about the Company's strong operating revenues and cash flows, which were historically used to pay substantial dividends.  Defendant Post also made it clear that the Board continually discusses cash flow allocation, dividend payouts, and potential stock repurchases. When questioned about CenturyLink's future dividend strategy, defendant Post acknowledged that when companies increase their dividend, they drive high value for shareholders.  More, despite the fact that the Board met in September 2012 to discuss future budget allocation in light of cash flow, and thus was well aware of the priority placed on the Company repaying its significant debt, defendant Post suggested that *the Company was considering using its cash flow to increase its dividend*.  Defendants Post and Ewing stated in relevant part:

> [Post]: And now on Slide 13, in summary, I am pleased with the third quarter results. We continue to improve our top line revenue trend, our employees did a good job of containing cost, and *we generated solid cash flows during the quarter.* We reduced our access line losses by 22% compared to the pro forma third quarter 2011 and we achieved high-speed internet subscriber growth as well as solid increase of Prism customers.

> \* \* \*

> [Ewing]: With that, let's turn to our results for the third quarter.

> *As you can see, we generated strong operating revenues and solid cash flows.* Operating revenues were $4.57 billion dollars on a consolidated basis, which was in line with our guidance for the quarter and represent a 1.3% decline from pro forma third quarter 2011 operating revenues. This also represents a solid improvement from the 4.6% annual decline in the year-ago period.

Strategic revenue in the quarter increased to 46% of total revenue from 43% in the pro forma third quarter a year ago, due to growth in strategic products such as high-speed internet, high-bandwidth data services, Prism TV and managed hosting services.

* * *

***We generated solid operating cash flow of approximately $1.9 billion for third quarter and achieved an operating cash flow margin of 41.5%.***

***Additionally, we generated $905 million of free cash flow during the quarter,*** which is defined as operating cash flow less cash paid for taxes, interest and capital expenditures and additional adjustments to other income. ***Our strong cash flows continue to provide us with the financial strength and flexibility to meet our business objectives and drive long-term shareholder value.***

* * *

Slide 20 addresses our fourth quarter and full year 2012 guidance, which includes the acquisition of Ciber. ***The company expects fourth quarter 2012 operating revenues and cash flow to increase compared to third quarter 2012*** due to anticipated continued growth in strategic revenues and lower outside plant maintenance and utility costs. Additionally, we expect depreciation and amortization to be $20 million to $30 million higher for fourth quarter 2012 than it was for the third quarter due to higher balances of plant and service and a one-time adjustment to software amortization that occurred in the third quarter. For the fourth quarter 2012, CenturyLink projects total operating revenues of $4.56 billion to $4.61 billion and operating cash flow between $1.9 billion and $1.94 [billion] and adjusted EPS is expected to be $0.64 to $0.69. To reflect the year-to-date performance and fourth quarter expectations, we've also updated our previously given full year 2012 guidance, and this is provided in our press release.

Turning to Slide 21. In summary, we are generating solid strategic revenue growth. We achieved good cost containment during the quarter and achieving Qwest synergies earlier than anticipated, originally anticipated. ***Finally, we continue to believe a solid balance sheet is important to have financial flexibility, and feel confident about our cash flow generating ability, which allows CenturyLink to return meaningful cash to our shareholders.***

* * *

[Analyst]: And then I guess the second question is, obviously the free cash flows are coming in ahead of expectations, the guidance is going up. I know that you guys have talked about stock buybacks as a priority for cash, but could you revisit your thinking about how you consider being a dividend paying company versus maybe being a dividend growth company, looking into maybe next year?

* * *

- 25 -

[Post]: *As far as the increasing the dividend or stock buybacks, that's obviously a question that we consider continually with our Board. We'll continue to evaluate the best ways to create value for shareholders. Obviously, how we utilize our cash is a key component of that process. We'll consider the opportunity to reduce debt and the value of debt reduction. We'll look at the benefits of increasing the dividend or buying back stock*, what that can mean to value for shareholders. And we'll continue to consider investment opportunities, both organic and inorganic that can drive value for shareholders. These are obviously important and complex considerations and we'll continue our very disciplined approach to these types of investment decisions, again with the objective of really maximizing long-term shareholder value.

[Analyst]: And Glen, if I could just follow up on that real quick. I mean obviously we saw about a 2.3% increase in the dividend from AT&T today. And I think investors tend to look at dividend growth companies as being a higher value proposition than simply companies that pay out a dividend. Do you agree with that statement? And do you think that CenturyLink has it within its financial wherewithal to maybe support that kind of limited amount of dividend growth, but growth nevertheless?

[Post]: I'm sorry.  Do I support what - agree with what statement?

[Analyst]: The idea that there's a higher value to companies that grow their dividend, even if it's only a small amount, as opposed to just simply keeping a dividend steady through time?

[Post]: *Well, yeah, I have seen some studies that indicate that companies grow their dividend do drive good value for shareholders.  So, yes, I have seen some of that, and I don't have any - don't disagree with the studies. It's something that we consider as we talk about our use of free cash flow basically every quarter and certainly every year, we talk in detail about what's the best way for us to drive long-term shareholder value. And we realize that growing dividends is one way that companies have done that over time*, so it is part of our consideration.

56.    On November 8, 2012, the Company filed a Quarterly Report on Form 10-Q for the third quarter of 2012 ended September 30, 2012, with the SEC.  The Form 10-Q reiterated that the Company had historically maintained a stable source of cash flow and noted that the Company expected to continue providing the same $0.725 quarterly dividend (or $2.90 annually).  The Form 10-Q stated in relevant part:

We have generally relied on cash provided by operations and our revolving credit facility to fund our operating and capital expenditures, make our dividend

payments and repay a portion of our maturing debt. ***Our operations have historically provided a stable source of cash flow that has helped us meet the needs of the business.***

\* \* \*

***We anticipate that our existing cash balances and net cash provided by operating activities will enable us to meet our other current obligations, fund capital expenditures and pay dividends to our shareholders.***

\* \* \*

***We currently expect to continue our current annual dividend of $2.90 per common share, subject to our board's discretion***.

57.     While CenturyLink's shares continued to trade at an artificially inflated price due to the Individual Defendants' misleading statements concerning the Company's anticipated future dividend payments, certain defendants dumped thousands of their personally held shares on an uninformed market.  For example, immediately following the above statements, on November 9, 2012, defendant Melville sold 1,400 shares for proceeds of $54,684.  On November 12, 2012, defendant Zimmel sold 10,938 shares for proceeds of $427,181.40, and defendant Nichols sold 1,300 shares for proceeds of $50,716.90.

58.     On November 13, 2012, CenturyLink issued a press release announcing that the Company's Board again voted to declare a quarterly cash dividend of $0.725 per share.

59.     While the market was improperly led to believe the high dividend would continue through 2013, on November 28, 2012, defendant Owens sold 5,000 shares for proceeds of $191,215.  A few days later, on December 3, 2012, defendant Melville sold another 500 shares for proceeds of $19,465.

60.     On December 5, 2012, the Company participated in the UBS Global Media and Communications Conference with investors and analysts.   During the conference call, a participant asked if CenturyLink's residual cash flow would allow the Company to lower debt,

institute a buyback, and issue a small dividend increase.  In response, defendant Ewing touted the Company's access to free cash flow and assured the market that *the Company did not expect significant changes to the dividend*.  In particular, defendant Ewing stated in relevant part:

> [Analyst]: Maybe just to follow up on that, given the residual free cash flow that you had this year and estimates for next year, do you think all options are on the table, basically meaning you do have flexibility maybe to lower debt, but also institute a buyback or maybe a small dividend increase? Would you consider all three?
>
> [Ewing]: Yes, we would. And Glen addressed this on our last quarter call that basically we would potentially look at all three options in 2013. Our capital budget in 2013 will probably be within $100 million or so plus or minus of where it is in 2012, and so *we'll have free cash flow available in 2013*. And I think we'll look at all options in terms of whether we use it to pay debt down, use a portion of it for that, look at a share buyback program, or look at smaller incremental increases in the dividend. If you look back over our history, before we really significantly increased our dividend in 2007, we had – the four or five years prior to that, we've repurchased about a third of our shares. So *we are more predisposed I think to probably share repurchases than any significant change in the dividend* because really, frankly, at this price we can buy our stock back and decrease our dividend payout ratio and the gross amount of the dividend that we pay along the way.

61.     Immediately after the above misleading statements, on December 7, 2012, defendant Gephardt dumped 1,780 of his personally held shares for proceeds of $67,360.54.

## THE TRUTH EMERGES

62.     On February 13, 2013, CenturyLink shocked the market when the Company issued a press release entitled "CenturyLink revises capital allocation strategy."  Despite repeated assurances by the Individual Defendants that the dividend would likely either stay the same or increase, and despite the Individual Defendants' acknowledgement that the Company's high share price was highly contingent on maintaining or increasing dividends, the press release disclosed that the Board now intended to slash the Company's quarterly dividend rate to $0.54, from $0.725.  The press release further revealed that this staggering 25% dividend reduction would be used to repay debt and to facilitate the Company's repurchase of up to $2 billion of its

outstanding common stock.  The press release stated in relevant part:

> CenturyLink, Inc. (NYSE: CTL) today announced that the company's board of directors has authorized certain capital allocation initiatives that further enable its strategy of investing in key drivers to stabilize and grow operating revenues.
>
> ***The CenturyLink board has authorized the repurchase of up to an aggregate $2.0 billion of the company's outstanding common stock.*** The company expects to execute this share repurchase program primarily in open market transactions, subject to market conditions and other factors, and expects to complete the program by its scheduled termination date of February 13, 2015. CenturyLink intends to fund the share repurchase program primarily with free cash flow generated by the business.
>
> ***In connection with the new repurchase program, the board also indicated its intention to revise the company's quarterly dividend rate to $0.54 from $0.725 per share.*** The board expects to approve this new rate at its next regularly-scheduled meeting on February 26, 2013, with the change effective with the March 2013 quarterly dividend payment.
>
> ***CenturyLink also expects to utilize a portion of its free cash flow generated in 2013 and 2014 to repay debt and maintain leverage at less than 3.0 times EBITDA*** (earnings before interest, taxes, depreciation and amortization).
>
> "CenturyLink has made significant progress over the last several years in improving our top-line revenue trend," said Glen F. Post, III, chief executive officer and president. "We have continued to achieve strong operating revenue performance, cash flows and broadband growth, and we remain focused on enhancing long-term shareholder value."
>
> "The share repurchase program, which will be accretive to free cash flow per share, along with our very competitive cash dividend, will enable us to significantly increase the total cash returned to our shareholders in 2013 and 2014. Additionally, we are positioning the company to maintain a dividend payout ratio of less than 60 percent of free cash flow after we have fully utilized our federal income tax net operating loss carryforwards," said Post.
>
> "We are confident that the capital allocation initiatives we announced today will allow us to continue our investments to drive strategic revenue growth, while maintaining our focus on creating long-term shareholder value," concluded Post.

63.     Following the above press release, on the same day, CenturyLink conducted an

earnings conference call with analysts and investors. Despite previous assurances that the

Company had enough cash flow to pay dividends and also pay its debt, defendants Post and

Ewing blamed the dividend slash on the need for debt reduction.  Defendant Post admitted, however, that the need to cut the dividend in order to pay debt was known to the Board since at least the end of 2012 when the Board was finalizing the Company's 2013 budgets.  Defendants Post and Ewing stated, in relevant part:

> [Post]: Now turning to slide 11, I want to address our announcement today regarding changes to our capital allocation strategy.  ***We have decided to repurchase up to an aggregate $2 billion of our outstanding common stock over the next two-year period ending February 13, 2015, and we've decided to reduce our quarterly dividend to $0.54 a share from $0.725 per share.***
>
> Just a little history here as a backdrop. ***As we were finalizing our budgets for 2013 and in working with the rating agencies, it became apparent that in order to maintain the investment grade ratings, we needed to reduce investment – we needed to reduce investments in the business, in our growth – that is investments really in our growth initiatives, and/or we needed to reduce the dividend significantly and use 100% of the free cash flow to repay debt.*** Again, if we were going to maintain our investment grade rating. ***We've decided that it is not [sic] in the long term best interest of the company and our investors to significantly reduce the dividend and use the proceeds to pay back debt to maintain the investment grade rating.***
>
> We believe it is important to continue to invest capital in our growth initiatives that will help bring us revenue and EBITDA growth and return capital, return cash to shareholders as well. Also we've determined that if we were willing to accept the loss of investment grade rating, we could return more cash to shareholders during 2013 and 2014 than we were even with reducing the current dividend and while in implementing a share repurchase program. We decided to take advantage of the opportunity to get more cash to shareholders now and adjust the dividend to a level that would be closer to the payout ratio that we have historically maintained after we've utilized all of our NOLs. We expect to be a full cash taxpayer in 2015. And as with this plan, we'll be able to continue to invest in our business, our growth initiatives at a strong level. We worked to make our decision based on our ability to drive long term shareholder value and we believe this decision, these decisions, these changes, will do just that.
>
> \* \* \*
>
> [Ewing]: ***We generated solid operating cash flow of approximately $1.91 billion for the fourth quarter and achieved an operating cash flow margin of 41.7%. Additionally, we generated $610 million of free cash flow during the quarter***, which is defined as operating cash flow less cash paid for taxes, interest and capital expenditures and additional adjustments to other income. Our strong cash

flows continue to provide us the financial strength to meet our business objectives and drive long-term shareholder value.

* * *

But basically, we plan on using the free cash flow that's created as a result of the dividend reduction which is about $450 million a year to repurchase shares. Plus we'll use about $1.1 billion of our free cash flow to repurchase shares as well.

64.     As a result of these disclosures, CenturyLink's stock plummeted, shedding more than 22% of its value on February 14, 2013, the Company's largest one-day stock drop in at least thirty-three years.  The decline wiped out nearly $6 billion in market capitalization in a single day.

## REASONS THE STATEMENTS WERE IMPROPER

65.     The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing:

(a)     that the Company was planning to slash its dividend to pay its debt and commit significant free cash flow towards the repurchase of billions of dollars of CenturyLink stock; and

(b)     as a result of the foregoing, representations concerning the Company's future dividend payments and free cash flow expenditures were improper.

## INSIDER SALES BY DEFENDANTS POST, PUCKETT, ZIMMEL, MELVILLE, OWENS, GEPHARDT, AND NICHOLS

66.     Rather than providing the market with correct information, the Insider Selling Defendants used their knowledge of CenturyLink's material, non-public information to sell their personal holdings while the Company's stock was artificially inflated.  As officers and directors of CenturyLink, the Insider Selling Defendants were privy to material, non-public information about the Company's true business health, and were well aware that the Company's stock price

was heavily reliant on the market's belief that the Company's dividends would remain the same or be increased, but that the Company intended to slash the 2013 dividend in order to pay off debt and consummate the repurchase.  Indeed, defendants have admitted that: (i) the Board continually discussed free cash flow allocations and dividends; and (ii) as a result of 2013 budget discussions, the Board knew by at least the end of 2012 that the Company would reduce its 2013 dividend in order to focus on debt repayment.

67.     Defendant Post is CenturyLink's CEO and a director of the Company.  As both a member of the Company's management and Board, defendant Post was responsible for allocating the Company's cash flow distribution and determining the amount of dividend the Company would pay out in any given quarter.  Defendant Post was therefore privy to material, non-public information concerning the Company's budget, as well as the Company's plans to slash its dividend to pay its debt and commit significant free cash flow towards the repurchase of billions of dollars of CenturyLink stock.  Defendant Post was also privy to material, non-public information concerning the inaccuracy of CenturyLink's disclosures in the Company's press releases and public filings regarding the above.

68.     While in possession of this knowledge, defendant Post sold 100,000 shares of his personally held CenturyLink stock for proceeds of over $4.3 million.  Defendant Post's sales were timed to maximize profit from CenturyLink's then artificially inflated stock price. Defendant Post's sales are also suspicious given that he did not sell a single share during the first eight months of fiscal year 2012 prior to these sales.

| | |
|---|---:|
| Shares Sold During Sales Period ("SP") | 100,000 |
| Shares Remaining After Sales | 767,126 |
| Total Shares Before Sales | 867,126 |
| **Total Proceeds from Sales** | **$4,305,470.00** |
| **% of Total Ownership Sold During SP** | **11.53%** |

69.     Defendant Puckett is CenturyLink's COO.  As a key member of CenturyLink's management, defendant Puckett was therefore privy to material, non-public information concerning the Company's budget, as well as the Company's plans to slash its dividend to pay its debt and commit significant free cash flow towards the repurchase of billions of dollars of CenturyLink stock.  Defendant Puckett was also privy to material, non-public information concerning the inaccuracy of CenturyLink's disclosures in the Company's press releases and public filings regarding the above.

70.     While in possession of this knowledge, defendant Puckett sold 50,000 shares of her personally held CenturyLink stock for proceeds of over $2.1 million.  Defendant Puckett's sales were timed to maximize profit from CenturyLink's then artificially inflated stock price. Defendant Puckett's sales are also suspicious given that she did not sell a single share during the first eight months of fiscal year 2012 prior to these sales.

| | |
|---|---|
| Shares Sold During SP | 50,000 |
| Shares Remaining After Sales | 263,008 |
| Total Shares Before Sales | 313,008 |
| **Total Proceeds from Sales** | **$2,153,655.00** |
| **% of Total Ownership Sold During SP** | **15.97%** |

71.     Defendant Zimmel is a CenturyLink director.  As a member of CenturyLink's Board, defendant Zimmel was responsible for allocating the Company's cash flow distribution and determining the amount of dividend the Company would pay out in any given quarter. Defendant Zimmel therefore was privy to material, non-public information concerning the Company's budget, as well as the Company's plans to slash its dividend to pay its debt and commit significant free cash flow towards the repurchase of billions of dollars of CenturyLink stock.  Defendant Zimmel was also privy to material, non-public information concerning the inaccuracy of CenturyLink's disclosures in the Company's press releases and public filings regarding the above.

- 33 -

72.     While in possession of this knowledge, defendant Zimmel sold 10,938 shares of his personally held CenturyLink stock for proceeds of $427,181.40.  Defendant Zimmel's sales were timed to maximize profit from CenturyLink's then artificially inflated stock price.  Defendant Zimmel's sales are also suspicious given that he did not sell a single share during the first eight months of fiscal year 2012 prior to these sales.

| | |
|---|---|
| Shares Sold During SP | 10,938 |
| Shares Remaining After Sales | 26,244 |
| Total Shares Before Sales | 37,182 |
| **Total Proceeds from Sales** | **$427,181.40** |
| **% of Total Ownership Sold During SP** | **29.42%** |

73.     Defendant Melville is a CenturyLink director.  As a member of CenturyLink's Board, defendant Melville was responsible for allocating the Company's cash flow distribution and determining the amount of dividend the Company would pay out in any given quarter. Defendant Melville therefore was privy to material, non-public information concerning the Company's budget, as well as the Company's plans to slash its dividend to pay its debt and commit significant free cash flow towards the repurchase of billions of dollars of CenturyLink stock.  Defendant Melville was also privy to material, non-public information concerning the inaccuracy of CenturyLink's disclosures in the Company's press releases and public filings regarding the above.

74.     While in possession of this knowledge, defendant Melville sold 5,501 shares of his personally held CenturyLink stock for proceeds of $227,518.18  Defendant Melville's sales were timed to maximize profit from CenturyLink's then artificially inflated stock price. Defendant Melville's sales are also suspicious given that they represented more than twice as much as the holdings percentage that he sold during first eight months of fiscal year 2012.

| | |
|---|---|
| Shares Sold During SP | 5,501 |
| Shares Remaining After Sales | 7,048 |
| Total Shares Before Sales | 12,549 |
| **Total Proceeds from Sales** | **$227,518.18** |
| **% of Total Ownership Sold During SP** | **43.84%** |

75.     Defendant Owens is a CenturyLink director.  As a member of CenturyLink's Board, defendant Owens was responsible for allocating the Company's cash flow distribution and

determining the amount of dividend the Company would pay out in any given quarter. Defendant Owens therefore was privy to material, non-public information concerning the Company's budget, as well as the Company's plans to slash its dividend to pay its debt and commit significant free cash flow towards the repurchase of billions of dollars of CenturyLink stock.  Defendant Owens was also privy to material, non-public information concerning the inaccuracy of CenturyLink's disclosures in the Company's press releases and public filings regarding the above.

76.     While in possession of this knowledge, defendant Owens sold 5,000 shares of his personally held CenturyLink stock for proceeds of $191,215.  Defendant Owens' sales were timed to maximize profit from CenturyLink's then artificially inflated stock price.  Defendant Owens' sales are also suspicious given that they represented almost twice as much as the holdings percentage that he sold during first eight months of fiscal year 2012.

| | |
|---|---|
| Shares Sold During SP | 5,000 |
| Shares Remaining After Sales | 13,333 |
| Total Shares Before Sales | 18,333 |
| **Total Proceeds from Sales** | **$191,215.00** |
| **% of Total Ownership Sold During SP** | **27.27%** |

77.     Defendant Gephardt is a CenturyLink director.  As a member of CenturyLink's Board, defendant Gephardt was responsible for allocating the Company's cash flow distribution and determining the amount of dividend the Company would pay out in any given quarter. Defendant Gephardt therefore was privy to material, non-public information concerning the Company's budget, as well as the Company's plans to slash its dividend to pay its debt and commit significant free cash flow towards the repurchase of billions of dollars of CenturyLink stock.  Defendant Gephardt was also privy to material, non-public information concerning the inaccuracy of CenturyLink's disclosures in the Company's press releases and public filings regarding the above.

78.     While in possession of this knowledge, defendant Gephardt sold 1,780 shares of his personally held CenturyLink stock for proceeds of $67,360.54.  Defendant Gephardt's sales were timed to maximize profit from CenturyLink's then artificially inflated stock price. Defendant Gephardt's sales are also suspicious given that he did not sell a single share during the first eight months of fiscal year 2012 prior to these sales.

| | |
|---|---|
| Shares Sold During SP | 1,780 |
| Shares Remaining After Sales | 8,638 |
| Total Shares Before Sales | 10,418 |
| **Total Proceeds from Sales** | **$67,360.54** |
| **% of Total Ownership Sold During SP** | **17.09%** |

79.     Defendant Nichols is a CenturyLink director.  As a member of CenturyLink's Board, defendant Nichols was responsible for allocating the Company's cash flow distribution and determining the amount of dividend the Company would pay out in any given quarter. Defendant Nichols therefore was privy to material, non-public information concerning the Company's budget, as well as the Company's plans to slash its dividend to pay its debt and commit significant free cash flow towards the repurchase of billions of dollars of CenturyLink stock.  Defendant Nichols was also privy to material, non-public information concerning the inaccuracy of CenturyLink's disclosures in the Company's press releases and public filings regarding the above.

80.     While in possession of this knowledge, defendant Nichols sold 1,300 shares of his personally held CenturyLink stock for proceeds of $50,716.90.  Defendant Nichols' sales were timed to maximize profit from CenturyLink's then artificially inflated stock price.

| | |
|---|---|
| Shares Sold During SP | 1,300 |
| Shares Remaining After Sales | 10,266 |
| Total Shares Before Sales | 11,566 |
| **Total Proceeds from Sales** | **$50,716.90** |
| **% of Total Ownership Sold During SP** | **11.24%** |

81.     The Insider Selling Defendants' sales were timed to maximize profit from the Individual Defendants overall scheme to artificially inflate CenturyLink's stock price.  Following the misleading statements made on during the second half of 2012, the Company's stock price fluctuated at an artificially inflated price of between $37.53 and $42.78.   Notably, between August 8, 2012 (when the Individual Defendants began improperly suggesting the dividend would maintain or increase its payout for 2013) and February 8, 2013 (when the Individual Defendants admitted the dividend would be slashed), the Individual Defendants sold more than $7.42 million worth of their personally held stock.

82.     In sum, defendants Post, Puckett, Zimmel, Melville, Owens, Gephardt, and Nichols sold over $7.42 million worth of stock at artificially inflated prices as detailed by the chart below:

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| GEPHARDT | 12/7/2012 | 1,780 | $37.84 | $67,360.54 |
|  |  | **1,780** |  | **$67,360.54** |
|  |  |  |  |  |
| MELVILLE | 8/10/2012 | 600 | $42.40 | $25,440.00 |
|  | 8/15/2012 | 3,001 | $42.63 | $127,929.18 |
|  | 11/9/2012 | 1,400 | $39.06 | $54,684.00 |
|  | 12/3/2012 | 500 | $38.93 | $19,465.00 |
|  |  | **5,501** |  | **$227,518.18** |
|  |  |  |  |  |
| NICHOLS | 11/12/2012 | 1,300 | $39.01 | $50,716.90 |
|  |  | **1,300** |  | **$50,716.90** |
|  |  |  |  |  |
| OWENS | 11/28/2012 | 5,000 | $38.24 | $191,215.00 |
|  |  | **5,000** |  | **$191,215.00** |
|  |  |  |  |  |
| POST | 8/9/2012 | 100,000 | $43.05 | $4,305,470.00 |
|  |  | **100,000** |  | **$4,305,470.00** |
|  |  |  |  |  |
| PUCKETT | 8/9/2012 | 50,000 | $43.07 | $2,153,655.00 |
|  |  | **50,000** |  | **$2,153,655.00** |
|  |  |  |  |  |
| ZIMMEL | 11/12/2012 | 10,938 | $39.05 | $427,181.40 |
|  |  | **10,938** |  | **$427,181.40** |

| | | | | |
|---|---|---|---|---|
| Total: | | 174,519 | | $7,423,117.02 |

## DAMAGES TO CENTURYLINK

83.     As a result of the Individual Defendants' improprieties, CenturyLink disseminated improper, public statements concerning the Company's business prospects and dividends.  These improper statements have devastated CenturyLink's credibility as reflected by the Company's almost $6 billion, or over 22%, market capitalization loss.

84.     Further, as a direct and proximate result of the Individual Defendants' actions, CenturyLink has expended, and will continue to expend, significant sums of money.   Such expenditures include, but are not limited to:

(a)     costs incurred from defending and paying any settlement in the class actions for violations of federal securities laws; and

(b)     costs incurred from compensation and benefits paid to the defendants who have breached their duties to CenturyLink, including all ill-gotten gains from insider selling by defendants.

85.     Moreover, these actions have irreparably damaged CenturyLink's corporate image and goodwill.  For at least the foreseeable future, CenturyLink will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in improper behavior and have misled the investing public, such that CenturyLink's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

86.     Plaintiff brings this action derivatively in the right and for the benefit of CenturyLink to redress injuries suffered, and to be suffered, by CenturyLink as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding

and abetting thereof, by the Individual Defendants.  CenturyLink is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

87.     Plaintiff will adequately and fairly represent the interests of CenturyLink in enforcing and prosecuting its rights.

88.     Plaintiff was a shareholder of CenturyLink at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current CenturyLink shareholder.

89.     The current Board of CenturyLink consists of the following thirteen individuals: defendants Post, Zimmel, Melville, Owens, Gephardt, Nichols, Perry, Hanks, Brown, Roberts, Boulet, McCray, and Siegel.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because Defendants Post, Zimmel, Melville, Owens, Gephardt, Nichols, Perry, Hanks, Brown, Roberts, Boulet, McCray, and Siegel Face a Substantial Likelihood of Liability for Their Misconduct**

90.     As alleged above, defendants Post, Zimmel, Melville, Owens, Gephardt, Nichols, Perry, Hanks, Brown, Roberts, Boulet, McCray, and Siegel continuously discussed the Company's budget and free cash flow allocation, and were solely responsible for determining the amount of cash flow to use for paying dividends and paying off Company loans.  As the Company was creating its 2013 budget in the second half of 2012, these defendants were intimately aware of the need to reduce debt at CenturyLink.  Thus, these defendants knew that in order to pay off the Company's debt, CenturyLink would be forced to slash its dividend. Nonetheless, the Director Defendants breached their fiduciary duty of loyalty by knowingly or recklessly causing or allowing the Company to issue numerous improper or misleading statements indicating that the Company would either maintain or increase its dividend for 2013.

The Director Defendants also breached their duty of loyalty by failing to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures.

91.     Defendant Post breached his fiduciary duty of loyalty by making numerous improper statements in the Company's press releases and SEC filings regarding the Company's decision to slash the dividend to pay off debt and initiate a stock repurchase.

92.     Defendants Brown, Hanks, Roberts, and Zimmel, as members of the Audit Committee, reviewed and approved the improper statements and earnings guidance.  The Audit Committee's Charter provides that it is responsible for compliance with financial reporting requirements and monitoring the integrity of the Company's financial statements and related disclosures.  Defendants Brown, Hanks, Roberts, and Zimmel discussed the Company's core operations during Audit Committee meetings, including whether the Company intended to use its significant cash flow to maintain a high a dividend rate for its shareholders.  As a result of these meetings and their duties as members of the Audit Committee, defendants Brown, Hanks, Roberts, and Zimmel were aware that the Company's statements concerning its business health and intention to maintain or increase the dividend were improper.  Thus, the Audit Committee Defendants were responsible for knowingly or recklessly allowing the improper statements related to the Company's earnings guidance and financial and disclosure controls.  Accordingly, the Audit Committee Defendants breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein.  Thus, the Audit Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

93.     Defendants Post, Zimmel, Melville, Owens, Gephardt, and Nichols sold CenturyLink stock under highly suspicious circumstances.  These defendants as directors and/or

Audit Committee members of CenturyLink, possessed material, non-public Company information and used that information to benefit themselves.  Defendants Post, Zimmel, Melville, Owens, Gephardt, and Nichols sold stock based on this knowledge of material, non-public Company information regarding: (i) the Company's decision to slash its long-standing dividend in order to pay off debt and commence the repurchase; and (ii) the impending decrease in the value of their holdings of CenturyLink.  Accordingly, defendants Post, Zimmel, Melville, Owens, Gephardt, and Nichols face a substantial likelihood of liability for breach of their fiduciary duties of loyalty.  Any demand upon defendants Post, Zimmel, Melville, Owens, Gephardt, and Nichols is futile.

94.     In addition to the above, Defendant Gephardt is CEO, President, and a principal of Gephardt Group LLC ("Gephardt Group"). In 2012, CenturyLink paid fees of approximately $279,400 to Gephardt Group for consulting services.  As a result, as admitted in the Company's 2013 Proxy Statement, defendant Gephardt is not independent.  Thus, defendant Gephardt lacks independence from the remaining demonstrably interested directors, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action.

95.     Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek to recover for CenturyLink for any of the wrongdoing alleged by plaintiff herein.

96.     Plaintiff has not made any demand on the other shareholders of CenturyLink to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)     CenturyLink is a publicly held company with over 609 million shares outstanding and hundreds of shareholders;

(b)      making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of shareholders; and

(c)      making demand on all shareholders would force plaintiff to incur excessive expenses, assuming all shareholders could be individually identified.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

97.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

98.     The Individual Defendants owed and owe CenturyLink fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe CenturyLink the highest obligation of good faith, fair dealing, loyalty, and due care.

99.     The Individual Defendants and each of them, violated and breached their fiduciary duties of candor, good faith, and loyalty.  More specifically, the Individual Defendants violated their duty of good faith by creating a culture of lawlessness within CenturyLink, and/or consciously failing to prevent to Company from engaging in the unlawful acts complained of herein.

100.     The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.   The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing that the Company was planning to slash its dividend and commit significant free cash flow towards paying off its debt and the repurchase of billions of dollars of CenturyLink.  Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

101.    The Director Defendants, Post, Zimmel, Melville, Owens, Gephardt, Nichols, Perry, Hanks, Brown, Roberts, Boulet, McCray, and Siegel, as directors of the Company, owed CenturyLink the highest duty of loyalty.  These defendants breached their duty of loyalty by causing or allowing the Company to issue numerous improper statements concerning the Company's purported plans to maintain or increase the dividend.  Defendants Post, Zimmel, Melville, Owens, Gephardt, Nichols, Perry, Hanks, Brown, Roberts, Boulet, McCray, and Siegel knew or were reckless in not knowing that the Company was planning to slash its dividend and commit significant free cash flow towards the repurchase of billions of dollars of CenturyLink stock.  These defendants also breached their duty of loyalty by failing to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures. Accordingly, defendants Post, Zimmel, Melville, Owens, Gephardt, Nichols, Perry, Hanks, Brown, Roberts, Boulet, McCray, and Siegel breached their duty of loyalty to the Company.

102.    The Audit Committee Defendants, Brown, Hanks, Roberts, and Zimmel, breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions.  The Audit Committee Defendants completely and utterly failed in their duty of oversight, and defendants Brown, Hanks, Roberts, and Zimmel failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

103.    Defendants Post, Puckett, Zimmel, Melville, Owens, Gephardt, and Nichols breached their duty of loyalty by selling CenturyLink stock on the basis of the knowledge of the improper information described above before that information was revealed to the Company's shareholders.   The information described above was proprietary, non-public information

concerning the Company's future business prospects.  It was a proprietary asset belonging to the Company, which defendants Post, Puckett, Zimmel, Melville, Owens, Gephardt, and Nichols used for their own benefit when they sold CenturyLink common stock.

104.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, CenturyLink has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

105.    Plaintiff, on behalf of CenturyLink, has no adequate remedy at law.

## COUNT II

### Against the Individual Defendants for Waste of Corporate Assets

106.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

107.    As a result of the misconduct described above, the Individual Defendants have wasted corporate assets by forcing the Company to expend valuable resources in defending itself in the securities class action that they brought on with their improper statements.  In addition, the Individual Defendants have caused CenturyLink to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

108.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

109.    Plaintiff, on behalf of CenturyLink, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Unjust Enrichment

110.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

111.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of CenturyLink.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to CenturyLink.

112.    Defendants Post, Puckett, Zimmel, Melville, Owens, Gephardt, and Nichols sold CenturyLink stock while in possession of material, adverse non-public information that artificially inflated the price of CenturyLink stock.  As a result, defendants Post, Puckett, Zimmel, Melville, Owens, Gephardt, and Nichols profited from their misconduct and were unjustly enriched through their exploitation of material and adverse inside information.

113.    Plaintiff, as a shareholder and representative of CenturyLink, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

114.    Plaintiff, on behalf of CenturyLink, has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of CenturyLink, demands judgment as follows:

A.    Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.      Directing CenturyLink to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect CenturyLink and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote of the following Corporate Governance Policies:

1.      a provision to control insider selling;

2.      a proposal to strengthen the Company's controls over financial reporting;

3.      a proposal to strengthen CenturyLink's oversight of its disclosure procedures;

4.       a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; and

5.      a provision to permit the shareholders of CenturyLink to nominate at least three candidates for election to the Board;

C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of CenturyLink has an effective remedy;

D.      Awarding to CenturyLink restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants, including all ill-gotten gains from insider selling by defendants;

E.       Awarding to plaintiff the costs and disbursements of the action, including

reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.       Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: July 22, 2013                        LUNDY, LUNDY, SOILEAU & SOUTH, L.L.P.

                                            /s/ Matthew E. Lundy
                                            MATTHEW E. LUNDY (#18988)
                                            501 Broad Street
                                            Lake Charles, LA 70601
                                            Telephone: 337-513-0292
                                            Facsimile: 337-439-1029
                                            mlundy@lundylawllp.com

                                            ROBBINS ARROYO LLP
                                            BRIAN J. ROBBINS
                                            KEVIN A. SEELY
                                            MICHAEL J. NICOUD
                                            600 B Street, Suite 1900
                                            San Diego, CA 92101
                                            Telephone: (619) 525-3990
                                            Facsimile: (619) 525-3991
                                            brobbins@robbinsarroyo.com
                                            kseely@robbinsarroyo.com
                                            mnicoud@robbinsarroyo.com

                                            LAW OFFICES OF NICHOLAS
                                               KOLUNCICH III, LLC
                                            NICHOLAS KOLUNCICH
                                            6501 Americas Parkway NE, Suite 620
                                            Albuquerque, NM 87110
                                            Telephone: (505) 881-2228
                                            Facsimile: (505) 881-4288
                                            nkoluncich@newmexicoclassactions.com

879403

<u>VERIFICATION</u>

I, Cullen Rosen, hereby declare as follows:

I am the plaintiff in the within entitled action.  I have read the Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment.  Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: _7 – 1 6 – 2013_

_Cullen Rosen_
CULLEN ROSEN

_Lisa N Warner_
NOTARY
My commission expires 1-31-2017