**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**MONROE DIVISION**

| | | |
|---|---|---|
| IN RE CENTURYLINK, INC. | ) | Master Case No. 3:13-cv-2318-RGJ-JDK |
| SECURITIES LITIGATION | ) | |
| | ) | (Consolidated with 3:13-cv-02983-RGJ-JDK) |
| This Document Relates to: | ) | (Consolidated with 3:14-cv-00658-RGJ-JDK) |
|   Member Case No. 3:14-cv-658-RGJ-JDK | ) | (Consolidated with 3:14-cv-00659-RGJ-JDK) |
|   Member Case No. 3:14-cv-659-RGJ-JDK | ) | |
| | ) | |

<u>**FIRST AMENDED SECURITIES CLASS ACTION COMPLAINT**</u>

Lead Plaintiffs Gary Littrell and Westchester Putnam Counties Heavy & Highway Laborers Local 60 Benefit Funds (collectively, the "Lead Plaintiffs"), on behalf of themselves and all others similarly situated, by their undersigned attorneys, allege the following upon personal knowledge as to themselves and their acts, and upon information and belief as to all other matters, based upon the ongoing investigation of counsel.  Many of the facts related to Lead Plaintiffs' allegations are known only by the Defendants, or are exclusively within their custody or control. Lead Counsel's investigation included, among other things: (a) review and analysis of public filings made by Defendant CenturyLink, Inc. ("CenturyLink" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of the Defendants' public documents, conference calls and press releases; (c) review and analysis of media and securities analysts' reports and advisories concerning the Company; (d) publicly available data relating to CenturyLink common stock; and (e) interviews with former Company employees. Lead Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.   NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than the Defendants Glen F. Post, III ("Post"), R. Stewart Ewing, Jr. ("Ewing"), and David D. Cole ("Cole") (together with the Company, "Defendants") who purchased CenturyLink common stock between August 8, 2012 and February 13, 2013, inclusive (the "Class Period"), and who were damaged thereby (the "Class"), seeking to recover damages caused by Defendants' violations of the Securities Exchange Act of 1934 (the "Exchange Act").  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any

1

entity in which Defendants have or had a controlling interest.

2.      Defendant CenturyLink provides communications and data services to residential, business, governmental, and wholesale customers.  Over the past decade, CenturyLink has become the third largest telecommunications company in the United States through a series of acquisitions of smaller access line providers and regional telecommunications companies.

3.      CenturyLink's history of acquisitions is in part responsible for the Company's sudden decision to slash its dividend by 25% and resulting in one of the largest one-day stock drops the Company's history.  Recently, CenturyLink acquired Embarq Corporation (a large independent local exchange carrier) for $11.6 billion.  In 2010, CenturyLink acquired Qwest Communications ("Qwest"), a national telecommunications carrier, through a stock transaction valued at $22.4 billion.  The following year, in 2011, CenturyLink acquired Savvis (a provider of "enterprise could computing" and related technology services) for $2.5 billion.  Pursuant to the terms of each deal, CenturyLink assumed Embarq Corporation's, Qwest's, and Savvis' outstanding debt of $5.8 billion, $11.8 billion, and $700 million (respectively).

4.      CenturyLink's free cash flow and levels of debt were serious subjects of discussion.  While the Company obtained net operating losses ("NOLs") from its previous acquisitions and was able to carry them forward into the future for the purpose of offsetting gains, the Company could only do so for a limited number of years.  Recognizing this, credit rating agencies (e.g., Standard & Poor's, Moody's, Fitch) began questioning CenturyLink's investment grade rating.

5.      Notwithstanding its vast amount of debt and impending free cash-flow crunch once the Company could no longer use its NOLs to offset income, Defendants assured investors throughout the Class Period that it would be able to maintain its credit rating and quarterly dividend

2

of 72.5 cents per share or $2.90 per share annually (which at the time equated to a yield of over 7%, unusually high for a common stock).  As detailed below, CenturyLink falsely represented through press releases, conference calls, analyst conferences, and SEC filings that it was financially capable of maintaining the status quo, and in fact misled investors into thinking that a dividend *increase* was possible.

6.     As a result of Defendants' materially false and misleading statements, CenturyLink's common stock traded at artificially inflated prices during the Class Period, reaching an intraday high of $43.43 on August 9, 2012.

7.     After the market closed on February 13, 2013, and after Company insiders had made nearly $8 million over the course of the Class Period by trading on insider information, CenturyLink shocked the market by announcing that its Board of Directors had authorized a new "capital allocation strategy" whereby the Company would be immediately slashing its quarterly dividend by 25% from $0.725 to $0.54 per share.  Moreover, with the money purportedly saved from the dividend cut (approximately $500 million) and additional funds from free cash flows, the Company would begin repurchasing outstanding shares (up to $2 billion worth of its common stock).  On this news, the stock price plummeted on extremely high volume of over 70 million shares traded, dropping from a closing price of $41.69 on February 13, 2103 to a closing price of $32.27 on February 14, 2013, a decline of over 22%, and resulting in one of the largest one-day stock drops the Company's history, instantly wiping out approximately $6 billion in market value:



8.     Defendants withheld the truth from its investors as long as they could.  Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Having been aware of the Company's tenuous credit rating from as early as April 2011, when Standard & Poor's downgraded its rating from BBB- to BB, Defendants attempted to assure investors as best they could that the dividend would remain the same and its credit rating would remain strong.  However, with the expiration of the NOLs and the impending free cash-flow crunch, Defendants were left with no option but to reveal its "capital allocation strategy" and suffer the loss of over $6 billion in market capitalization and downgrades from Moody's and Fitch.

9.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered

4

significant losses and damages.

## II.   JURISDICTION AND VENUE

10.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

11.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

12.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b), as the Company's headquarters are located in this District.

13.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## III.   PARTIES

### A.   Lead Plaintiffs

14.     Court-appointed Lead Plaintiffs Gary Littrell and Westchester Putnam Counties Heavy & Highway Laborers Local 60 Benefit Funds each purchased CenturyLink common stock during the Class Period and have suffered damages as a result.  Lead Plaintiffs' certifications were previously filed with the Court in connection with their respective motions for appointment as Lead Plaintiff, and are incorporated herein by reference.

### B.   Defendants

15.     Defendant CenturyLink is a Louisiana corporation with its headquarters at 100 CenturyLink Drive, Monroe Louisiana 71203. Its common stock is traded on the New York Stock

Exchange under the ticker symbol "CTL."

16.     Defendant Post was, at all relevant times, President and Chief Executive Officer ("CEO") of CenturyLink.  Post has been a member of the Company's Board of Directors since 1985, CEO since 1992, and President since 2009.  Prior to becoming CEO, Post held various positions within CenturyLink, including Treasurer, Chief Financial Officer, and Chief Operating Officer.  Post has considerable experience in the financial operations of CenturyLink. Given his role as CEO and position of the Company's board of Directors, Post was aware or should have been aware of the impact of the NOLs on the Company's future cash flows and intimately involved in the decision-making process with respect to the Company's dividend.

17.     Defendant Ewing was, at all relevant times, Executive Vice President ("EVP") and Chief Financial Officer ("CFO") of CenturyLink.  Ewing has been EVP and CFO since 1989. Ewing joined CenturyLink in 1983 and has held numerous positions within the Company prior to his becoming EVP and CFO, including Senior Vice President, Controller, and Vice President of Finance.  Ewing has considerable experience in the financial operations of CenturyLink. Given his role as CFO, Ewing was aware of the impact of the NOLs on the Company's future cash flows and participated in the decision-making process with respect to the Company's dividend

18.     Defendant David D. Cole ("Cole") was, at all relevant times, Senior Vice President—Controller and Operations Support.  Prior to becoming Senior Vice President—Controller and Operations Support, Cole was Senior Vice President—Operations Support from 1999 to 2011.  Cole acted as the Company's Chief Accounting Officers and signed the Company's Forms 10-Q on behalf of the Company.  Given his role as Senior Vice President—Controller and Operations Support, Cole was aware of the impact of the NOLs on the Company's future cash

flows and the ability of the Company to fund certain dividend obligations

19.     Post, Ewing, and Cole are collectively referred to hereinafter as the "Individual Defendants."  Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     directly participated, evaluated, supervised, and managed dividend payments;

(c)     were directly involved in the evaluation of the Company's ability to pay dividends and the amount of the dividend to be paid by the Company;

(d)     were aware of the impact of the NOLs against the Company's future cash flows and the ability of the Company to fund certain dividend obligations;

(e)     was directly involved in the day-to-day operations of the Company at the highest levels;

(f)     was privy to confidential proprietary information concerning the Company and its business and operations;

(g)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(h)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(i)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(j)     approved or ratified these statements in violation of the federal securities laws.

20.     CenturyLink is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

21.     The scienter of the Individual Defendants and other employees and agents of the

7

Company is similarly imputed to CenturyLink under *respondeat superior* and agency principles.

**IV.   CENTURYLINK LIES ABOUT THE PRESSING NEED TO CUT ITS DIVIDEND**

    **A.   CenturyLink: A "Dividend Aristocrat"**

22.    CenturyLink is an integrated communications company engaged primarily in providing an array of communications services to various residential, business, governmental and wholesale customers.  The Company's communications services include local and long-distance, network access, private line (including special access), public access, broadband, data, managed hosting (including cloud hosting), colocation, wireless and video services. In select markets, the Company also provides local access and fiber transport services to local exchange carriers and security monitoring.

23.    CenturyLink is the third largest telecommunications company in the United States in terms of lines served, behind AT&T and Verizon.  It operates in 37 states, generally across the Western, Midwestern and Southern U.S.  The Company also operates over four dozen data centers across North America, South America, Europe and Asia.

24.    CenturyLink is an S&P 500 constituent.  Because of its high dividend, CenturyLink was once considered a "Dividend Aristocrat" by Standard & Poor's, until it was stripped of that designation in 2012.  According to *Forbes*, a Dividend Aristocrat is a company that has increased its dividend payouts for at least 25 consecutive years.  As a group, the Dividend Aristocrats have historically provided slightly better performance and slightly lower volatility than the S&P 500 as a whole.[1]

---

[1]  *See*  http://www.forbes.com/sites/moneybuilder/2012/01/06/sp-dividend-aristocrats-for-2012/ (last accessed: May 2, 2014).

25.     Throughout the Class Period, the Company paid an extremely high dividend of 7.25%.  This dividend made the Company extremely attractive to investors.  Analysts, investors, and management were all well aware of the fact that the Company's stock price was being maintained by the dividend.  As Donna Jaegers, an analyst with D.A. Davidson & Co. told the *Minneapolis Star Tribune* only two weeks before the end of the Class Period, "[i]f they cut the dividend, the stock price would go lower. . . . all you get is the dividend—there is no capital appreciation."

### B.     The Company Struggles to Compete in a Dying Industry

26.     A large part of CenturyLink's business is individual "land lines."  The Company has been described as a "respected, traditional telephone operator," and "a rural phone operator at its core."[2]  CenturyLink's land line business, however, is gradually dying as a result of increasing competition from broadband and wireless service providers.  A March 27, 2011 article in *The Denver Post*, written in the wake of the Qwest acquisition, asked the "strategic question" of "how the company will grow revenue long term in a dying business."[3]  Another article published in *The Denver Post* on April 2, 2011, observed that:

> CenturyLink's acquisition binge comes as the nation's landline phone business is eroding.  Millions of consumers dump wireline phone service annually, relying solely on cellphones or switching to Internet-based voice offerings from cable-TV companies.[4]

27.     This trend certainly held true for CenturyLink.  Indeed, in the twelve months ended

---

[2] *See* http://www.denverpost.com/ci_17756207 (last accessed May 2, 2014).

[3] *See* http://www.denverpost.com/ci_17704874 (last accessed May 2, 2014).

[4] *See* http://www.denverpost.com/ci_17756207 (last accessed May 2, 2014).

December 2012, the Company lost 5.5% of its individual telephone lines, a decline of over 836,000 lines.   As a result of the dying land line business, CenturyLink sought to stay competitive by growing and diversifying into other fields such as broadband access, managed data hosting, cloud data hosting, and wireless services.

28.     The Company sought to introduce new products such as Prism TV, an IPTV service similar to and competitive with AT&T's Uverse product.   Confidential Witness ("CW")[5] [6] recalled that the outlook was "not looking great" in terms of meeting revenue and customer goals for Prism TV.   CW 1 explained that these goals were set for the year in advance (i.e., the goals for 2012 were set at the end of 2011).   Moreover, "it was no big secret" within CenturyLink that it was facing subscriber shortfalls for the product.   By the time CW 1 left the Company, it had only achieved 77% of the subscribers that it hoped to sign up to date.

29.     Other efforts to expand the Company's product offerings fared no better.   CW 2[7] recalls that, despite being given sales quotas for cloud-based and hosted voice-over-IP (VoIP) products beginning in 2012, these products and services were never officially "launched" and available for clients.   The official launch date for these services was moved back from 2012 to early 2013, but according to CW 2, were still not available as of the time she resigned.

---

[5] To protect their anonymity, all CWs are referred to in the feminine.

[6] CW 1 was a contract Financial Analyst at CenturyLink where she worked from December 2011 to September 2012.  She reported to Chris Selby, who in turn reported to Chris LaNasa.  CW 1 was responsible for financial forecasting relating to Prism TV.

[7] CW 2 was a Business Sales Consultant who worked at CenturyLink from 2010 to April 2013. She reported to Senior Vice President Todd Davis.  Her job responsibilities required CW 2 to engage in business to business sales, with a focus on enterprise accounts that spent at least $50,000 per year on telephone and internet services.

30. To remain competitive, CenturyLink also embarked on an "acquisition spree," as *The Wall Street Journal* described it.[8]  This "spree" began with the Company's acquisition of Embarq in July 2009.[9]  The terms of the $11.6 billion all stock transaction included CenturyLink assuming $5.8 billion of Embarq's debt.  Less than a year later, CenturyLink announced that it would acquire Qwest Communications ("Qwest") in another all-stock transaction.  This $22.4 billion acquisition was completed on April 1, 2011, and its terms similarly required CenturyLink to assume the astronomical $11.8 billion debt that Qwest had on its books.  The Qwest acquisition made CenturyLink the owner of one of the so-called "Baby Bells," as Qwest itself had merged with US West in 2000.  *The Wall Street Journal* noted that "one of the key reasons" CenturyLink acquired Qwest "was its stronger business presence, which Qwest Communications has built up."[10]

31. On July 15, 2011, CenturyLink acquired Savvis for $2.5 billion.  CenturyLink assumed $700 million of Savvis' debt (which represented all outstanding shares of Savvis common stock at $40 per share).  *Dealbook* noted that the Savvis acquisition would allow CenturyLink to expand its data storage services for global companies,[11] thus facilitating the Company's move into the managed hosting and cloud services areas, vital field that would be ripe for future development.

---

[8]  *See*  http://online.wsj.com/news/articles/SB10001424052748704187604576288610141952924 (last accessed May 2, 2014).

[9] While *The Wall Street Journal* describes CenturyLink's "spree" as beginning in July 2009, the Company had been making steady acquisitions since 2000 with a series of purchases of access lines from a number of regional telecommunications company including General Telephone & Electronics Corp., Telephone USA of Wisconsin LLC, ALLTEL Inc., and others.

[10]  *See*  http://online.wsj.com/news/articles/SB10001424052748704187604576288610141952924 (last accessed May 2, 2014).

[11]  *See*  http://dealbook.nytimes.com/2011/04/27/centurylink-to-buy-savvis-for-2-5-billion/  (last accessed May 2, 2014).

32.     Similarly, *The Wall Street Journal* explained that the Savvis acquisition "pushes CenturyLink further into cloud computing, a hot area in the tech sector that enables access to computer services and data storage over the Internet."[12]   The Savvis acquisition would "help CenturyLink strengthen its position in the business market," as "[m]ore than half of the combined company's revenue is expected to come from business customers."

33.     From nearly the beginning, however, problems arose out of the Savvis deal.  CW 3[13] described a brain drain of Savvis' top talent after in the wake of the acquisition.  She explained that Savvis was more "nimble," as an IT company would normally be, whereas CenturyLink was more cumbersome and "slow to make decisions."  CW 3 explained that CenturyLink dragged its feet for several months before approving the much-needed "retention" incentive program, which only then began to stem the loss of top Savvis talent.

34.     CW 3 further explained that Savvis' revenues began declining, in large part due to Reuters' declining revenue.  Reuters was Savvis' largest client, and the two initially entered into a five-year agreement in April 2007 for Savvis to improve the reliability and scalability of the flagship Reuters.com web site.  In 2009, Reuters signed a three year extension of the agreement with Savvis for managed hosting and network services.  CW 3 explained that Reuters began suffering from declining revenues beginning in 2013, which would have impacted Savvis' overall revenue.

---

[12] *See*  http://online.wsj.com/news/articles/SB10001424052748704187604576288610141952924 (last accessed May 2, 2014).

[13] CW 3 was a former Director of Human Resources for Savvis from 2008 until April 1, 2013.  In this role CW 3 was responsible for overseeing Savvis' Human Resources Information System, and for transitioning the Savvis Human Resources Department into the CenturyLink Human Resources Group.

35.     CenturyLink's "acquisition spree" did not come cheaply.  A February 27, 2012 *Seeking Alpha* described the debt taken on as a result of the Embarq Corporation and Qwest Communications acquisitions as "a significant red flag" and "another scary factor on the balance sheet."[14]  According to the article, excluding intangible goodwill, CenturyLink's $21 billion in debt contributed to an aggregate of $35 billion in total liabilities, compared against $34.3 billion in assets (excluding goodwill).  The article went on to comment that due to its "huge debt on the balance sheet and shrinking revenues," the Company would not be able to "keep up" with the dividends paid by other telecom giants such as Verizon and AT&T.

36.     Moreover, CenturyLink's problems were not confined to the acquisitions themselves, but also flowed from the very synergies that were supposed to boost the Company's revenues.  CW 4[15] recalled that, unlike Qwest, CenturyLink did not merge the financial and accounting functions of acquired companies as an integral part of CenturyLink.  CW 4 stated that she learned "enough to be dangerous" on the main SAP system that CenturyLink used so that she could format Qwest's results in a manner that CenturyLink could use.  CW 5[16] explained that as a result of its accounting practices, the increase in personnel data after acquisitions became

---

[14]  *See*  http://seekingalpha.com/article/395111-debt-ridden-centurylink-should-follow-frontier-and-slash-its-dividend (last accessed May 2, 2014).

[15]  CW 4 was a Senior Financial/Business Analyst and legacy Qwest employee who worked at CenturyLink until June 2012.  During her tenure, she was responsible for accounting and reconciling various intercompany transactions within Qwest.

[16]  CW 5 worked for CenturyLink from July 1994 to September 2006, and again from July 2010 to February 2013.  Beginning in July 2010, she held the position of Financial Analyst in the Engineering Department.  In this position she reported directly to Defendant Cole, and was responsible for compiling all of the financial data from the Engineering Department.  Beginning in December 2011, CW 5 became a Lead Analyst in the Engineering Department, where she was assigned to review the status of contractor-assigned projects.

"unmanageable."  Indeed, CW 6[17] described CenturyLink as having "one of the worst financial reporting" systems she had experienced, and that it was "a mess."  CW 6 described CenturyLink as having "a lot of artificial and real walls" that obstructed the flow of information, to the extent that if she wanted to look at a 10-K or 10-Q, she would have to pull the report from Yahoo! Finance or the SEC's Edgar database, since there was no way internally that she knew of that would permit her to do so.

37.     In addition, CW 7[18] recalled that, because CenturyLink's network expansion projects required a human resources representative to be present at certain meetings, CW 7 was 'well aware of the plans" the Company had to expand its network and that this represented "a huge cost."  Furthermore, CW 7 remembered seeing the budgets for these network expansion plans and therefore "could see a concern" in terms of achieving revenue goals and the costs that were going to be incurred.  As CW 7 put it, "something had to give."

### C.     Credit Ratings Agencies Put CenturyLink Squarely Between a Rock and Hard Place

38.     Against the backdrop of a dying industry and crushed by tens of billions of dollars' worth of debt incurred as a result of its acquisition binge, CenturyLink found itself in an unenviable position.  Matters took a turn for the worse when Moody's and Fitch began discussions with the

---

[17] CW 6 was a Lead Senior Financial Analyst at CenturyLink from October 2012 through August 2013, where she was responsible for evaluating topline revenue performance to determine whether CenturyLink's marketing campaigns and associated expenditures were having an effect on revenue.

[18] CW 7 worked at CenturyLink from June 2007 to November 2013, where she was a Director of Human Resources at CenturyLink.  In this position, CW 7 led a team of six human resources partners who provided support to the Wholesale Enterprise Group, the Corporate Services Groups, which were comprised of finance, corporate strategy, the IT Consulting Group, the Public Policy and Regulatory Group, and Legal and Human Resources.

Company about its ability to maintain its credit rating.[19]

39.     Defendant Ewing told investors that the Company met with the credit ratings agencies every quarter, and had face-to-face visits "a couple times a year."  He explained that these meetings had already occurred prior to the first day of the Class Period, and summarized the agencies' main areas of concern.  For example, Moody's informed the Company that it had to reduce its debt-to-EBITDA ratio to 3x, while Fitch told the Company that it focused on the dividend payout.

40.     The Company met with the credit ratings agencies throughout the third and fourth quarters of 2012, including in September, after a Board meeting, and in November.  Defendant Post later explained that the question of how large the dividend should be is something that is considered "continually with our board."  Defendant Ewing would also later explain to investors on the September 13, 2013 Bank of America Merrill Lynch Media, Communications & Entertainment Conference that CenturyLink planned to approach Moody's with two to three quarters of data in order to remove the negative outlook placed on the Company – which itself is a precursor to a credit ratings downgrade.

41.     Soon enough, though, as Defendant Post would later admit, the ratings agencies informed the Company that to keep its investment grade rating, it needed to cut the dividend and use all of its free cash flow to pay down the billions of dollars' worth of debt on its balance sheet.

---

[19] Institutional investors such as pension funds, retirement systems and banks are often prohibited from transacting in securities if they fall below a certain credit rating threshold.  During the Class Period, approximately 700 institutions held roughly 74% of all of CenturyLink's outstanding shares.  A credit rating downgrade could cause an avalanche of institutional sales and a cratering stock price, further endangering CenturyLink at a fragile time in the Company's operations.

42.     Notably, CW 8[20] recalled that after the dividend cut, Defendant Post held a Company-wide "Q and A" session during which he answered questions from CenturyLink employees.  CW 8 said that during the meeting, Post confessed that he should have "prepped the market ahead of the dividend cut as opposed to announcing the cut."

43.     Accordingly, at the start of the Class Period, the Defendants were faced with a dire situation, with a grim industry outlook combined with massive amounts of debt.  Nonetheless, the Defendants were well-aware that a key component of the Company's stock price was its status as a "Dividend Aristocrat," and they chose to conceal the need to cut the dividend until they could sell millions of dollars' worth of their own stock at artificially inflated prices.

### D.     Company Insiders Reap Millions of Dollars in Stock Sales While Leaving Investors Out in the Cold

44.     Despite the fact that senior Company executives and directors had access to material non-public information – in that they knew (or should have known) of CenturyLink's impending dividend cut – they nevertheless sold millions of dollars' worth of CenturyLink stock at artificially inflated prices and reaped millions of dollars in illicit profits as a result.  As senior executives and directors, these individuals either had a duty to not sell CenturyLink common stock under these circumstances, or had a duty to disclose the material, non-public information prior to selling the stock.

45.     Specifically, while in the possession of material, non-public information, Company insiders, including certain of the Individual Defendants, engaged in the following illicit sales of

---

[20] CW 8 worked at CenturyLink from June 2007 to March 2014.  From April 2011 to March 2014, she was the Director of CenturyLink's Internal Contact Center, where she oversaw a team of engineers and project managers, who themselves oversaw the Company's contact center positions.

CenturyLink common stock:

| Date | Insider | Position | Shares Sold | Value |
|------|---------|----------|-------------|-------|
| 08/09/12 | Stacey W. Goff | EVP/Secretary/General Counsel | 10,000 | $432,700 |
| 08/09/12 | Defendant   Glen   F. Post | President/CEO | 100,000 | $4,305,000 |
| 08/09/12 | Karen A. Puckett | EVP/COO | 50,000 | $2,153,500 |
| 08/10/12 | CG Melville | Director | 600 | $25,440 |
| 08/14/12 | Maxine Moreau | SVP Network Services | 2,246 | $96,000 |
| 08/15/12 | CG Melville | Director | 3,001 | $127,932 |
| 11/09/12 | CG Melville | Director | 1,400 | $54,684 |
| 11/12/12 | Fred Nicholds | Director | 1,300 | $50,712 |
| 11/12/12 | Joseph Zimmel | Director | 10,938 | $427,128 |
| 11/28/12 | William Arthur Owens | Director | 5,000 | $191,200 |
| 12/03/12 | CG Melville | Director | 500 | $19,465 |
| 12/07/12 | Richard Gephardt | Director | 1,780 | $67,355 |

46.     Notably, the August 9, 2012 sales by Defendant Post and Karen Puckett were their first sales since December 2010.  Indeed, it is clear that all of these Company insiders suspiciously timed their sales of CenturyLink common stock, especially when compared to their sales during the rest of 2013:



47.    These sales were timed to gain maximum profit while CenturyLink common stock was artificially inflated.  In fact, Defendant Post, Stacey Goff (EVP/Secretary/General Counsel) and Karen Puckett (EVP/COO) all sold on August 9, 2012 – the very same day that the Company's common stock hit an intraday Class Period (and yearly) high of $43.43 per share.  CG Melville rode their coattails, selling his shares a day later.  The stock would never close above $43 for the entire Class Period.  In all, Company insiders illicitly reaped nearly $8 million in the process:



## V.   THE TRUTH IS REVEALED

48.   On February 13, 2013, after the market closed, CenturyLink shocked the public,

causing a frenzy among investors and analysts, when it issued a press release entitled "CenturyLink

revises capital allocation strategy"  The press release stated in relevant part:

MONROE, La., Feb. 13, 2013 /PRNewswire/ -- CenturyLink, Inc. (NYSE: CTL) today announced that the company's board of directors has authorized certain capital allocation initiatives that further enable its strategy of investing in key drivers to stabilize and grow operating revenues.

The CenturyLink board has authorized the repurchase of up to an aggregate $2.0 billion of the company's outstanding common stock. The company expects to execute this share repurchase program primarily in open market transactions, subject to market conditions and other factors, and expects to complete the program by its scheduled termination date of February 13, 2015. CenturyLink intends to fund the share repurchase program primarily with free cash flow generated by the business.

In connection with the new repurchase program, the board also indicated its

19

intention to revise the company's quarterly dividend rate to $0.54 from $0.725 per share. The board expects to approve this new rate at its next regularly-scheduled meeting on February 26, 2013, with the change effective with the March 2013 quarterly dividend payment.

CenturyLink also expects to utilize a portion of its free cash flow generated in 2013 and 2014 to repay debt and maintain leverage at less than 3.0 times EBITDA (earnings before interest, taxes, depreciation and amortization).

"CenturyLink has made significant progress over the last several years in improving our top-line revenue trend," said Glen F. Post, III, chief executive officer and president. "We have continued to achieve strong operating revenue performance, cash flows and broadband growth, and we remain focused on enhancing long-term shareholder value.

"The share repurchase program, which will be accretive to free cash flow per share, along with our very competitive cash dividend, will enable us to significantly increase the total cash returned to our shareholders in 2013 and 2014. Additionally, we are positioning the company to maintain a dividend payout ratio of less than 60 percent of free cash flow after we have fully utilized our federal income tax net operating loss carryforwards," said Post.

"We are confident that the capital allocation initiatives we announced today will allow us to continue our investments to drive strategic revenue growth, while maintaining our focus on creating long-term shareholder value," concluded Post.

49.     Later that same day, CenturyLink conducted an earnings conference call with analysts and investors hungry for answers after hearing the stunning news that the Company decided to slash dividends.  During the call, Defendants stated, in relevant part:[21]

[Post] Now turning to slide 11, I want to address our announcement today regarding changes to our capital allocation strategy. *We have decided to repurchase up to an aggregate $2 billion of our outstanding common stock for the next two-year period ending February 13, 2015, and we've decided to reduce our quarterly dividend to $0.54 a share from $0.725 per share.*

Just little history here is backdrop. *As we were finalizing our budget for 2013 and working with the rating agencies, it became apparent that in order to maintain investment grade ratings, we need to reduce investment. We need to reduce investments in the business and our growth that is investments and really on our*

---

[21] Unless otherwise indicated, all emphasis is added.

*growth initiatives, and/or we need to reduce dividend significantly and use 100% of free cash flow to repay debt. Again, if we want to maintain our investment grade rating, we decided that it is in the long-term best interest for the company and our investors to significantly reduce the dividend and use the proceed to payback debt to maintain investment grade rating.*

*We believe it is important to continue to invest capital in our growth initiatives that will help bring us to revenue and EBITDA growth and returning cash to shareholders as well. Also we determined if we were willing to accept the loss of investment grade rating we could return more cash to shareholder during 2013, 2014, and we were even with reducing the current dividend and while in implementing our share our repurchase program. We decided to take advantage of the opportunity to get more cash to shareholders now and adjust the dividend to a level that will be closer to the payout ratio that we have historically maintained actually we've utilized all our NOLs.*

*So, we expect to be a full cash taxpayer in 2015. And as with this plan, we will be able to continue to investment in our business and our growth initiatives at a strong level. We've worked to make our decisions based on our ability to drive long-term shareholder value and we believe these decisions, these changes will do just that.*

\*       \*       \*

*Finally, we believe the capital allocation initiatives announced today will further our strategy investing key drivers to stabilize and grow top line revenues. In addition to the share repurchase program our very competitive cash dividend we will be able to significantly increase the total cash returned to shareholders in the next two years.*

\*       \*       \*

**[Analyst]** Thanks, I just want to reconcile some of the prior comments that you had made. I think you had mentioned that if you are comfortable with revenue trends improving, stabilizing, you could even consider maybe a small dividend increase just to keep it consistent. I guess I just want to get a sense of how you feel about revenue trends going forward? Your 2015 dividend payout guidance of lower than 60%, I think implies a pretty significant decline to free cash flow per share from the current levels. Can you talk about that as well?

**[Ewing]** Yes. So, Batya, *the decline that you that you can back into basically by looking at the dividend payout ratio or the approximate dividend payout ratio in 2015 is really due to the fact that we, in 2014, would utilize all of the federal net operating loss carryforwards that we have and our cash taxes will increase substantially. But we expect, barring any changes in the tax loss, to increase substantially in 2015. So that's the reason. That's one of the reasons we decided*

*to go ahead and take advantage of this at this point in time and be proactive and try to address the dividend and again try to return more cash to shareholders over the next two years before becoming a full tax payer to allow us to retire 8% or more of our shares which will reduce the dividend even at the new rate by little over $100 million dollars, probably between now and 2015, which again allows us to really be a lot more comfortable with the dividend that we are moving to on a going forward basis.*

\*     \*     \*

**[Analyst]** Great. Thank you. So, in going through the process, just curious why wouldn't you consider cutting the dividend further or if you're applied standing up to the rating agencies a little bit, but why not leave the dividend where it is and just buyback less stock. What is sort of the thinking there. And if you're on a path to get to the point, where EBITDA is stable, why do we have to necessarily consider cutting the dividend or is there or is it just taking that much longer than your original plan when you look back in and acquiring Savvis and Qwest, is it just taking longer to get there?

**[Post]** I will start and let Stewart follow-up, Frank. First of all, we didn't think it was good to reduce the dividend further. We know that we believe we need to return cash to shareholders. We believe a 25% cut is something not what we would want to doing in a perfect world, but something we think is important to do now. We do want to maintain the payout ratio. *We've historically been comfortable with, and that 60% below or less than 60% ratio.*

*We felt like if we payback, if we continue with the dividend now, there is no real benefit in one sense, because once there is uncertainty about the 2015 payout ratio, then it's really like a one-time dividend or payout sales, we don't think is the right thing to do, so we decided it was better to buy stock back with those funds, plus additional another 50% of our free cash flow or so and take advantage of that accretion. And with the dividend at a level we are very comfortable with going forward.* What we won't see that we think the concern about the level of dividend we'd be paying. So, this really how we came to our conclusion. Stewart, you want to add anything to that?

**[Ewing]** *It's really, Frank, just thinking through and looking at what the cash taxes would be in 2015 and the impact of that on free cash flow and on the dividend payout ratio, and again the opportunity to retire 8% or more of the shares between now and then and really help further. I mean it's accretive to free cash flow per share and it will reduce the aggregate dividend going forward.*

\*     \*     \*

**[Analyst]** Hi, guys. So, with the lower payout ratio, can you help us think about the opportunity that this creates in terms of spending more CapEx or maybe going more aggressively after growth initiatives like the video business which is going to drive

a little more dilution upfront?

**[Ewing]** Phil, So, if we bought shares back with the free cash flow then basically we will not have the additional capital to invest over and above what we are investing today unless we lever the company up, so I mean I guess that's the other thing. As part of this too, we increased the leverage ratio to somewhat less than three times or no more than three times.

*But basically, we plan on using the free cash flow that's created as a result of the dividend reduction which is about $450 million a year to repurchase shares plus we'll add a use of about $1.1 billion of our free cash flow to repurchase shares as well.*

\*        \*        \*

**[Analyst]** Hey guys, thanks for taking the question. I will go back to the strategy change. I guess I wanted to give you guys maybe the opportunity. A lot of the questions have been okay. So Stewart, if nothing has changed in business from a year ago and we are looking at the same free cash flow in 2015 today that we are looking at before but what we have done is we have chosen the strategy now that's both led to debt downgrades and the 15% cut in the stock price but the argument is that we are going to create long-term value, but there is nothing on the acquisition table, there is nothing on the CapEx investment front that's going to be do anything different than what's been happening. So, what is the full argument now for CenturyLink now that you have done what you have done? How is CenturyLink better for the stockholders now?

**[Ewing]** So, David, I think the first is that basically, we were going to get downgraded anyway. *Based on the 2013 budgets and plan, short of cutting operating expenses or investment in areas that we think long-term will help us get to revenue and EBITDA stability. If we hadn't cut those, we couldn't have kept the investment grade rating. The other way to keep the investment grade rating would have been to cut the dividend and use that to pay debt back.*

*So, I mean we were going to get downgraded anyway. It would have been worse,* I think, for us to cut the dividend and basically use that to pay debt back at this point. *So looking at that, I guess as we have focused on 2013, we really started focusing on '15 and working through and trying to look at what taxes, cash taxes would potentially go to in '15 and that's when we realized as part of that that basically the dividend payout ratio was going to increase significantly in '15, if we didn't do something.*

*I guess we could have waited a year and a half or two years and see how that worked out but we decided it's better to be proactive and really try to buy stock back in the interim and keep investing in the business.* Nothing has changed in

23

the business really. Just keep investing in the business to stabilize and grow revenue and EBITDA.

***We felt like we were better off going ahead reducing the dividend now, buying shares back which reduces the shares outstanding by the time we get to 2015 which helps us really again stabilize and be confident that we can continue with the dividend that we have moved to, which is more in line with our historical payout ratio in the last two to three years in '15 than we would have been had we not done this at this point.***

**[Post]** I will just add, Dave that first of all, there is better visibility, as Stewart said, in 2015. Secondly, more confidence in our growth initiatives. We have seen those become real. We are where we made a choice to keep the dividend or increase the dividend and reduce our investment in the business, which we don't think is right. ***If we had not done this, we are looking at 2015 we think we are putting pressure on the stock price as we went into certainly in the '13 and '14, as we came forced to be cash taxpayer.*** So, you take all into consideration, this is the best strategy for our company long-term and for shareholders long-term. That's our view of it.

*       *       *

**[Post]** Throughout 2012, we made good progress on our key strategic initiatives and we believe these growth areas continue to strengthen our competitive position going into 2013. ***And, lastly, we believe the capital allocation changes we announced today will allow us to continue to invest in these strategic initiatives. They will help stabilize our top line revenue and strengthen our company's position long-term, while continuing to return significant cash to shareholders.***

50.     As a result of these disclosures, the price of CenturyLink's stock plummeted from a closing price of $41.69 on February 13, 2013 to a closing price of $32.27 on February 14, 2013; a decline of over 22%.  This decrease was a result of the artificial inflation caused by Defendants' false and misleading statements being removed from CenturyLink's price.

51.     Analysts savaged the Company's disclosure and emphasized its surprise to the market.  For example, in a report titled "Dividend Cut From Left Field," Thomas Seitz, an analyst with Jefferies & Co. stated, "CenturyLink reported solid 4Q12 results, ***but that was overshadowed by an unexpected dividend cut of 25%.***  The company also instituted a $2.0B share BB, and management indicated it was actually returning more cash to shareholders with this structure.  It

24

won't matter tomorrow."

52.     In an article in the *Wall Street Journal,* several analysts state their concerns regarding the future growth prospects of CenturyLink's stock following the dividend cut.[22] According to Philip Cusick of JPMorgan, "the revised cash plan [gives] more flexibility in the near-to medium-term for internal investment but little benefit for shareholders."  The article further states that "*[t]he move meant surrendering any effort to maintain investment-grade ratings on [the Company's] debt and prompted downgrades from several equity analysts, who raised concerns about the [Company's] future financial flexibility.*"

53.     Numerous other researchers and commentators took to *SeekingAlpha* to voice their surprise at the Company's new capital allocation strategy.  Saibus Research posted an article[23] stating that "[w]e were disappointed because we analyzed [CenturyLink's] dividend coverage back in September [2012] and saw no reason for CenturyLink to cut its dividend.  *Another reason why the dividend was such a shock was because Morgan Stanley rated it as one of its top dividend plats in telecom.*"  Saibus Research related CenturyLink's precipitous stock decline solely to its decision to cut its dividend, stating "*we are disappointed that CenturyLink's solid and decent performance for 2012 was overshadowed by its shocking deep dividend cut.*"

54.     In a report titled "You can't escape your roots; secular wireline pressures drive an unexpected dividend cut; downgrading to UP," Kevin Smithen and Zach Horat, analysts with Macquarie Capital stated, "In light of CTL's *surprise quarterly. dividend cut to $0.54 from $0.725*

---

[22] *See* http://online.wsj.com/article/BT-CO-20130214-711299.html (last visited May 2, 2014).

[23]   *See*   http://seekingalpha.com/article/1205821-centurylinks-dividend-reduction-diverts-from-decent-performance (last visited May 2, 2014).

and slight cuts to our already-below-consensus 2013 FCF estimates, we are downgrading CTL to Underperform from Neutral and cutting our PT to $33 based on a 6.5% yield on the new dividend rate.  Recent experience with FTR and Alaska is that rural telcos tend to overshoot on the downside following dividend cuts, as income funds and retail investors sell.  *CTL's cut was unexpected and the near-term reaction could be severe, in our opinion. . . . CTL mgmt. finally threw in the towel on its Investment Grade credit ratings*, announcing a change in capital allocation strategy, including a 25% dividend cut and $2bn buyback program."

55.   In a report titled "Downgrading CTL Given Lower Outlook on Shareholder Returns, Believe Stock is Fairly Valued Post-Dividend Cut," analysts with J.P. Morgan stated: "CTL saw the writing on the wall in 2015, cutting dividend now.  With cash taxes in 2015 looming, *CTL ripped the band-aid off and did what it believes is inevitable – cutting the dividend by 25% today.*  The company believes the new level is sustainable and leaves room to de-lever.  In the meantime the company did a 2-year $2 billion buyback authorization – essentially returning the excess cash flow before the tax hit as buybacks rather than dividend.  While we find the discipline admirable (we can't think of another example of this in telecom), the pain for CTL's shareholders is likely to be extreme."

56.   In a report titled "4Q Review: Surprise Dividend Cut, But Yield & Buybacks Remain Attractive," analysts with Morgan Stanley stated, "*We did not expect a dividend cut given the strong FCF payout ratio and improving trends*, but the mix shift toward lower margins and higher taxes in 2015 drove management's cautious decision, desiring to keep the payout ratio below 60% in 2015."

## VI.    FALSE AND MISLEADING STATEMENTS

### A.    False Statements Regarding CenturyLink's Dividend and Cash Flows

57.    Against this backdrop, beginning on August 8, 2012, CenturyLink made false and misleading statements concerning the Company's ability and intent to maintain their current rate of dividend payments.  On that day, CenturyLink issued a press release announcing the Company's quarterly earnings and held a conference call with analysts and investors to discuss the financial results.  During an exchange with an analyst, Defendant Ewing made the following misleading statements regarding the Credit Rating agency criteria and the impact on dividends:

[Analyst]: Can you give us any color on potential conversations you've had with the rating agencies as you look forward towards the end of the year and into 2013? Specifically have they provided any granularity around the criteria they might be looking for in order to maintain or stabilize the current ratings?

[Ewing]: Yes. . . .

With respect to Moody's and Fitch, on Moody's we had conversations with them. Their target more or less to take the negative outlook off the parent company is basically for them to be able to see that we can get down to 3 times debt to EBITDA based on their calculation, and they're willing to give us some time to do that and they understand where we are. We have a conversation with them each quarter and we have face-to-face visits a couple times a year. Expect to be able to give them our 2013 projections probably sometime after we meet with our board in September. So and again, I think they want to be able to see that we see clearly that we can get down to 3 times coverage, leverage on their basis in order to remove the negative outlook.

With Fitch, the dividend payout ratio is more what they look at and it's about 55%, which is in line with where we are. ***And I think they're willing to potentially give us a little flexibility if we need to make other investments that they can see are strategic investments from the standpoint of driving revenue in the future or preserving revenue,*** an example of that is Fiber-to-the-Tower. So that's kind of where we are with the agencies.

58.    On August 9, 2012, the Company filed its Form 10-Q for the period ending June 30, 2012.  This 10-Q was signed by Defendant Cole and certified by Defendants Post and Ewing.

27

The report continued to mislead investors by boasting that its ability to pay dividends stems from the Company's steady stream of free cash flows, and because of this it expects to continue the current dividend rate of $2.90 per share.  The report stated in relevant part:

> We have generally relied on cash provided by operations and our revolving credit facility to fund our operating and capital expenditures, make our dividend payments and repay a portion of our maturing debt. Our operations have historically provided a stable source of cash flow that has helped us meet the needs of the business.
>
> \*      \*      \*
>
> We anticipate that our existing cash balances and net cash provided by operating activities will enable us to meet our other current obligations, fund capital expenditures and pay dividends to our shareholders.
>
> \*      \*      \*
>
> **We currently expect to continue our current annual dividend of $2.90 per common share,** subject to our board's discretion.
>
> \*      \*      \*
>
> Net Operating Loss Carryforwards
> We are currently using federal net operating loss carryforwards ("NOLs") to offset a portion of our taxable income. We expect to deplete a significant portion of these NOLs and certain other deferred tax attributes by 2014, and substantially all of these tax benefits by 2015. **Once our NOLs are fully utilized, we expect that the amount of our cash flows dedicated to the payment of federal taxes will increase substantially. The amounts of those payments will depend upon many factors, including future earnings, tax law changes, and future tax circumstances.**

59.     On the heels of these August 8-9, 2012, false statements, Defendant Post, Karen Puckett and Stacey Goff collectively sold  160,000 shares of CenturyLink common stock, at an Class-Period intra-day high of $43.43, for a value of nearly $7 million.

60.     On September 13, 2012 the Company participated in the Bank of America Merrill Lynch Media, Communications & Entertainment Conference.   During this conference the Defendants mislead investors to expect the same or higher dividends in 2013, by falsely stating that an increase in dividend was a consideration in "driving potentially more value for shareholders."  The Defendants completely omitted any notion that cutting dividends was on the

table, and such a decision would be necessary after meeting with credit rating agencies. The

Defendants stated in relevant part:

> [**Analyst**] [H]istorically, you guys have said that significant changes in the dividend are really not in your future, that if you are going to return capital to shareholders after you delivered to appropriate degree, buybacks are really the way to do that.
>
> I guess my question is, to you is, guys like AT&T and Verizon have kind of gone a lot of credit before raising the divided a 0.5% a quarter or a couple percent a year, nothing significant, but it kind of makes them – it sends two signals. Number one, it says we are an income stream that grows. And number two, it says we are very confident in the long-term future of our business. Does that signaling resonate with you, do you see a value in that message that you could sent to investors?
>
> [**Ewing**] It does and as we look at 2013, we'll review our plans with our board and determine what to do with free cash flow in 2013, ***but I would say that a small increase in the dividend wouldn't be off the table that that would be something we consider*** and I think about and it's a – we understand and have had more communication from shareholders. I guess in the last six months, it seemed to be ***moving and drifting toward the dividend increase model from the standpoint of driving potentially more value for shareholders that way***. That being said, I mean, we're still pre-disposed from about to the – above of our stock and frankly, ***if we were to repurchase some of our shares, it actually helps us provide a little leeway per dividend increase potentially.*** So...

61.     On November 7, 2012, the Company held a conference call to discuss its quarterly

earnings with analysts and investors.  In his prepared remarks, Defendant Ewing stated:

> [**Ewing**] In summary, we're generating solid strategic revenue growth. We achieved good cost containment during the quarter and achieved Qwest synergies earlier than anticipated -- originally anticipated. ***And finally, we continue to believe a solid balance sheet is important to our financial flexibility and feel confident about our cash flow generating ability, which allows CenturyLink to return meaningful cash to our shareholders.***

62.     In response to certain analyst questions, Defendant Post continued to mislead

investors by falsely describing the Company's financial status and  free cash flow flexibility, and

maintaining that an increase in dividend was a true possibility

> [**Post**] I'm sorry, do I support what? Agree with what statement?

**[Analyst]** The idea that there's a higher value to companies that grow their dividend, even if it's only a small amount, as opposed to just simply keeping a dividend steady through time.

**[Post]** Yes, I have seen some studies that indicate that companies that grow their dividend do drive value -- good value for shareholders. So yes, I have seen some of that, and I don't have any -- don't disagree with the studies. It's something that we consider as we talk about our use of free cash flow basically every quarter and certainly every year. ***We talk in detail about what's the best way for us to drive long term shareholder value, and we realize that growing dividends is one way that companies have done that over time. So it is part of our consideration.***

63.     On November 8, 2012, the Company filed a Form 10-Q with the SEC setting forth

the financial results for the Company's third quarter 2012.[24]  The 10-Q stated, in relevant part:

As of September 30, 2012, we held cash and cash equivalents of $194 million compared to $128 million as of December 31, 2011 and had $1.72 billion available under our revolving credit facility, which is described further below (the "Credit Facility"). We have generally relied on cash provided by operations and our revolving credit facility to fund our operating and capital expenditures, make our dividend payments and repay a portion of our maturing debt. Our operations have historically provided a stable source of cash flow that has helped us meet the needs of the business.

As of September 30, 2012, we had a working capital deficit of $1.1 billion, reflecting current liabilities of $4.9 billion and current assets of $3.8 billion, compared to a working capital deficit of $500 million as of December 31, 2011. The change in our working capital position is primarily due to a $718 million increase in current maturities of long-term debt, as partially offset by decreases in our accounts payable balance and increases in current assets due to the reclassification of certain assets held for sale as current assets.

We anticipate that our existing cash balances and net cash provided by operating activities will enable us to meet our other current obligations, fund capital expenditures and pay dividends to our shareholders. We also may draw on our revolving credit facility as a source of liquidity if and when necessary.

During the nine months ended September 30, 2012, we received net proceeds of $3.4 billion from the issuance of senior notes and term loan borrowings effected in anticipation of paying down portions of our long-term debt.

---

[24] This 10-Q was signed by Defendant Cole and certified by Defendants Post and Ewing.

***We currently expect to continue our current annual dividend of $2.90 per common share,*** subject to our board's discretion. See "Risk Factors-Risks Affecting Our Business" in Item 1A of Part II of this report.

*       *       *

Net Operating Loss Carryforwards

We are currently using federal net operating loss carryforwards ("NOLs") to offset a portion of our taxable income. ***We expect to deplete a significant portion of these NOLs and certain other deferred tax attributes by 2014, and substantially all of these tax benefits by 2015. Once our NOLs are fully utilized, we expect that the amount of our cash flows dedicated to the payment of federal taxes will increase substantially.*** The amounts of those payments will depend upon many factors, including future earnings, tax law changes, and future tax circumstances. For additional information, see "Risk Factors—Risks Relating to our Recent Acquisitions" appearing in Item 1A of Part II of this report.

*       *       *

We cannot assure you whether, when or in what amounts we will be able to use Qwest's and Savvis' net operating losses.

At December 31, 2011, we had approximately $6.2 billion of federal net operating losses, or NOLs, of which, approximately $5.6 billion and $212 million relate to pre-acquisition losses of Qwest and Savvis, respectively. These NOLs can be used to offset our future federal and certain taxable income.

The acquisition of Qwest and Savvis caused an "ownership change" under federal tax laws relating to the use of NOLs. As a result, these laws could limit our ability to use their NOLs and certain other deferred tax attributes. Further limitations could apply if we are deemed to undergo an ownership change in the future. ***Despite this, we expect to use substantially all of these NOLs and certain other deferred tax attributes as an offset to our federal future taxable income by 2015, although the timing of that use will depend upon the consolidated group's future earnings and future tax circumstances.***

64.    Defendants' emphasized statements in the previous paragraphs were each materially false and misleading when made because:

      (a)    During their meetings with rating agencies, prior to and throughout the Class Period, Defendants knew or should have known that CenturyLink would have to cut dividends to reduce debt ratios in order to maintain their investment grade rating, or to lessen the downgrade in rating.

      (b)    Defendant Post confessed that he was not honest with the market, admitting

31

to his employees that he should have "prepped the market ahead of the dividend cut as opposed to announcing the cut."

(c)    Based on future tax liabilities, a decrease in dividend would be the only way that the Company could meet its debt maturities while maintaining leverage at less than 3.0 times EBITDA as required by credit rating agencies.

(d)    At no time was increasing the quarterly dividend an option for adding value for shareholders based on the Company's current financial outlook because the Company and Individual Defendants knew that less free cash flow would be available for dividend payments due to the inability to use certain NOLs and that the Company would be unable to meet the credit rating agencies' criteria for the desired investment rating.

(e)    The Company and the Individual Defendants knew the inability to use the Company's NOLs past 2014 would create an unsustainable drain on the Company's free cash flows when it became a full-cash taxpayer in 2015;

(f)    In order to offset the strain on free cash flows beginning in 2015, the Company's Board of Directors had already determined to cut the quarterly dividend paid to shareholders and initiate a share buyback program for the purpose of decreasing the amount of outgoing cash.

(g)    During the Class Period, Defendants were aware that the dividend needed to be cut in anticipation of the free cash-flow crunch, additional capital expenditures, acquisitions costs, increased tax obligations, and higher debt payments.

### B.    False Statements Regarding CenturyLink's Internal Controls

65.    Additionally, throughout the Class period, Defendants materially misrepresented CenturyLink's internal controls and procedures over financial reporting.  Specifically, in CenturyLink's annual and quarterly SEC filings, the Company misrepresented that, after an evaluation of CenturyLink's controls and procedures conducted by the Company's Management, including Defendants Post and Ewing, the Individual Defendants concluded that the disclosure controls and procedures are "***effective to provide reasonable assurance that the information required to be disclosed… is timely recorded, processed, summarized and reported.***"  In addition, Defendants Post and Ewing each falsely certified that the Company's financial statements were

accurate and fairly presented the Company's financial condition, certifying in pertinent part:

1. I have reviewed this … [r]eport … of CenturyLink, Inc.;

2. ***Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;***

3. ***Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;***

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a) ***designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;***

   b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, ***to provide reasonable assurance regarding the reliability of financial reporting*** and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c) ***evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and***

   d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial

33

reporting….25

66.     Additionally, Post and Ewing signed the certification in CenturyLink's SEC filings during the Class Period, pursuant to 18 U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, which stated the following:

> . . . [the undersigned] hereby certifies, that, to the best of his knowledge, the Report…fully complies with the requirements of Section 13(a) or, 15(d) of the Securities Exchange Act of 1934 and *the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the CenturyLink.26*

67.     Defendants' emphasized statements in the previous paragraphs were each materially false and misleading when made because:

(a)     The Company's financial forecasts were inaccurate and could not be relied upon because the Company and the Individual Defendants did not have the necessary operational and financial controls in place to when the statements were made.

(b)     The Defendants were well-aware (or should have known) of the need for strong internal controls, as Qwest had been fined $250 million dollars by the SEC for is own accounting scandals prior to its acquisition by CenturyLink.

(c)     As CW 6 described, CenturyLink's internal controls were "a mess" and "one of the worse financial reporting" systems she had experienced, to the extent that she knew of no way to access 10-Ks and 10-Qs internally, but rather had to obtain them from Yahoo! or the SEC's database.

(d)     As told by CW 4 the Company's new acquisitions were not financial integrated into CenturyLink's corporate structure, had no corporate financial oversight or accounting consistency in their financial reporting and forecasting, and maintained all of their financial records independently.

(e)     According to CW 2, for CenturyLink's marquee business to business cloud-based products, sales and revenue quotas were established despite the fact that the

---

25 This statement was repeated in substantially identical form in: 2Q2012 Form 10-Q at Ex-31.1, Ex-31.2 (filed August 9, 2012); 3Q2012 Form 10-Q at Ex-31.1, Ex-31.2 (filed November 8, 2012).

26 This statement was repeated in substantially identical form in: 2Q2012 Form 10-Q at Ex-32 (filed August 9, 2012); 3Q2012 Form 10-Q at Ex-32 (filed November 8, 2012).

products had not been fully developed or brought to market, which resulted in unreliable projections and incorrect financial results.

## VII.   THE SAFE HARBOR AND BESPEAKS CAUTION DOCTRINES DO NOT APPLY

68.   CenturyLink's "Safe Harbor" warnings accompanying its forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability. The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to the material misstatements and omissions pleaded herein.   Many of the statements pleaded herein were not identified as "forward-looking statements" when made, or indicated that actual results "could differ materially from those projected."  Nor were there any meaningful cautionary statements identifying the important factors that had already occurred or the known risks to make such warnings sufficient.

69.   Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of CenturyLink who knew that the FLS was false.  Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## VIII.   LOSS CAUSATION ALLEGATIONS

70.   During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of CenturyLink's

securities. This operated as a fraud or deceit on Class Period purchasers of CenturyLink's securities by failing to disclose to investors that the Company's operational and financial characterizations were materially misleading and misrepresented material information.  Later, when the truth was revealed and Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of CenturyLink's securities fell precipitously, as the artificial inflation came pouring out of the Company's stock price. As a result of their purchases of CenturyLink securities during the Class Period, Plaintiffs and other members of the Class suffered economic loss under the federal securities laws.

71.    On February 13, 2013, the Company announced that it would be slashing the dividend rate and initiating a stock repurchase program as a result of its ongoing discussions with the credit rating agencies regarding the Company's debt ratios, investment rating, and NOLs.  As a result, the stock price plummeted on extremely high volume of over 70 million shares traded, dropping from a closing price of $43.43 August 9, 2012 to a closing price of $32.27 on February 14, 2013, a decline of over 22%, instantly wiping out approximately $6 billion in market value and severely underperforming both the S&P 500 and the S&P Telecom Index (both of which indexes it is a constituent):



72.      By failing to disclose their decision to cut the dividend, Defendants withheld from investors the true nature of their investments in CenturyLink and presented a misleading picture of CenturyLink's business operations, internal procedures and finances.   Thus, instead of accurately disclosing the actual state of the Company's affairs during the Class Period, Defendants caused CenturyLink to conceal the truth.   Defendants' false and misleading statements had the intended effect and caused CenturyLink's common stock to trade at artificially inflated levels throughout the Class Period.   The stock price drops discussed herein caused real economic loss to investors who purchased the Company's securities during the Class Period.

73.      The decline in the price of CenturyLink's common stock after the truth came to light was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.   The timing and magnitude of CenturyLink's common stock price decline negates any inference that the loss suffered by Plaintiffs and other Class members was caused by

37

changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct.  The economic loss suffered by Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of CenturyLink's securities and the subsequent decline in the value of CenturyLink's securities when Defendants' prior misrepresentations concerning the Company's financial status and internal controls, as well as other fraudulent conduct, were revealed.

## IX.    CLASS ACTION ALLEGATIONS

74.    Plaintiffs brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired CenturyLink common stock during the Class Period and were damaged by the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

75.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, CenturyLink securities were actively traded on the New York Stock Exchange.  Although the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by CenturyLink or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.  As of August 2, 2012, several days before the start of the Class Period, CenturyLink had 622,649,622 shares of common stock outstanding.  Upon

information and belief, these shares are held by thousands if not millions of individuals located geographically throughout the country and possibly the world.   Joinder would be highly impracticable.

76.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

77.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

78.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

    (a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

    (b)    whether statements made by Defendants to the investing public during the Class Period misrepresented or omitted material facts about the business, operations and management of CenturyLink;

    (c)    whether the Individual Defendants caused CenturyLink to issue false and misleading financial statements during the Class Period;

    (d)    whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

    (e)    whether the prices of CenturyLink securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

    (f)    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

79.    A class action is superior to all other available methods for the fair and efficient

adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## X.    RELIANCE PRESUMPTION: FRAUD-ON-THE-MARKET DOCTRINE

80.    At all relevant times, the market for CenturyLink's common stock was an efficient market for the following reasons, among others:

(a)    CenturyLink's  common stock met the requirements for listing and was listed and actively traded on the New York Stock Exchange, an open and efficient market;

(b)    During the Class Period, on average, 2.3 million shares of CenturyLink's common stock were traded on a daily basis;

(c)    CenturyLink regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(d)    CenturyLink was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period.  Each of these reports was publicly available and entered the public marketplace;

(e)    Numerous firms were active market-makers in CenturyLink stock at all times during the Class Period;  and

(f)    Unexpected material news about CenturyLink was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

90.    As a result of the foregoing, the market for CenturyLink's common stock promptly digested current information regarding CenturyLink from all publicly available sources and reflected such information in CenturyLink's stock price.   Under these circumstances, all

purchasers of CenturyLink's common stock during the Class Period suffered similar injury through their purchase of CenturyLink's common stock at artificially inflated prices, and a presumption of reliance applies.

## XI.  APPLICABILITY OF PRESUMPTION OF RELIANCE: *AFFILIATED UTE*

81.     Neither Plaintiffs nor the Class need prove reliance - either individually or as a class because under the circumstances of this case, which involves a failure to disclose and a duty of disclosure, positive proof of reliance is not a prerequisite to recovery, pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.  Here, the facts withheld were material because a reasonable investor would have considered the ability of CenturyLink to continue paying dividends at its then-current rate critical in evaluating the investment potential of the Company.

## XII.  CLAIMS

### A.     Count One

**Violation of Section 10(b) of**
**The Exchange Act and Rule 10b-5**
**Promulgated Thereunder Against All Defendants**

82.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

83.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

84.      During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions,

practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of CenturyLink securities; and (iii) cause Plaintiffs and other members of the Class to purchase CenturyLink securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

85.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for CenturyLink securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about CenturyLink's finances.

86.     By virtue of their positions at CenturyLink, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made,

42

although such facts were readily available to defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

87.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of CenturyLink, the Individual Defendants had knowledge of the details of CenturyLink's internal affairs.

88.    The Individual Defendants are liable for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of CenturyLink.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to CenturyLink's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of CenturyLink securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning CenturyLink's business and financial condition which were concealed by defendants, Plaintiffs and the other members of the Class purchased CenturyLink securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

89.    During the Class Period, CenturyLink securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and

misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased shares of CenturyLink securities at prices artificially inflated by defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased said securities, or would not have purchased them at the inflated prices that were paid. At the time of the purchases by Plaintiffs and the Class, the true value of CenturyLink securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of CenturyLink securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

90.     By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

91.     As a direct and proximate result of defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

**B.      Count Two**

**Violation of Section 20(a) of The Exchange Act**
**<u>Against the Individual Defendants</u>**

92.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

93.     During the Class Period, the Individual Defendants participated in the operation and management of CenturyLink, and conducted and participated, directly and indirectly, in the

conduct of CenturyLink's business affairs. Because of their senior positions, they knew the adverse non-public information about CenturyLink's ability to continue to maintain its dividend rate in light of the Company's 2015 tax liability.

94.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to CenturyLink's financial condition and results of operations, and to correct promptly any public statements issued by CenturyLink which had become materially false or misleading.

95.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which CenturyLink disseminated in the marketplace during the Class Period concerning CenturyLink's payment of dividends and tax liability. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause CenturyLink to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of CenturyLink within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of CenturyLink securities.

96.     Each of the Individual Defendants, therefore, acted as a controlling person of CenturyLink. By reason of their senior management positions and/or being directors of CenturyLink, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, CenturyLink to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of CenturyLink and possessed the power to control the specific activities which comprise the primary

violations about which Plaintiffs and the other members of the Class complain.

97.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by CenturyLink.

## XIII.  PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

(a)  Determining that this action is a proper class action, certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Class Counsel;

(b)  Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)  Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)  Such other and further relief as the Court may deem just and proper.

## XIV.  JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED: May 2, 2014                    HOUCK & RIGGLE, LLC

                                      By:  /s/ *Tracy Houck*
                                      Tracy W. Houck, Esq.
                                      La. Bar. No 26660
                                      301 South Bonner Street
                                      P.O. Box 1958
                                      Ruston, Louisiana 71273
                                      Phone: (318) 255-4066
                                      Fax: (318) 366-8520
                                      THouck@suddenlinkmail.com

                                      *Plaintiffs' Liaison Counsel*

LEVI & KORSINSKY LLP
Nicholas I. Porritt, Esq. (*admitted pro hac vice*)
Adam M. Apton, Esq. (*admitted pro hac vice*)
1101 30th Street NW, Suite 115
Washington, D.C. 20007
Phone: (202) 524-4290
Fax: (202) 333-2121
NPorritt@zlk.com
AApton@zlk.com

SAXENA WHITE P.A.
Maya Saxena, Esq.
Joseph E. White, III, Esq.
Lester R. Hooker, Esq.
Brandon T. Grzandziel, Esq. (*admitted pro hac vice*)
2424 North Federal Highway, Suite 257
Boca Raton, Florida 33431
Phone: (561) 394-3399
Fax: (561) 394-3382
mSaxena@saxenawhite.com
jwhite@saxenawhite.com
lhooker@saxenawhite.com
brandon@saxenawhite.com

*Plaintiffs' Co-Lead Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing has been served via the Court's electronic noticing system to all counsel of record this 2nd day of May, 2014.


_/s/_____