c

RECEIVED

USDC, WESTERN DISTRICT OF LA
TONY R. MOORE, CLERK

= 2 / 3 / 15

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

IN RE CENTURYLINK, INC.                MASTER CASE NO.  3:13-CV-02318
SHAREHOLDER DERIVITIVE ACTION          (Consolidated    3:13-cv-02983)
                                       (Consolidated    3:14-cv-00658)
                                       (Consolidated    3:14-cv-00659)

VERSUS

                                       DISTRICT JUDGE ROBERT G. JAMES
GLEN F. POST IIII, et al.              MAGISTRATE JUDGE JAMES D. KIRK


REPORT AND RECOMMENDATION

Before the court is defendants' motion to dismiss (Doc. 54) the

federal securities class action complaint filed by lead plaintiffs,

Gary Litrell and Westchester Putnam Counties and Highway Laborers

Local 60 Benefit Funds ("plaintiffs").  Plaintiffs filed suit against

CenturyLink, Inc. ("CenturyLink"), Glen F. Post III ("Post"), R.

Stewart Ewing, Jr. ("Ewing") and David D. Cole ("Cole") (collectively

referred to as "defendants") on behalf of all persons[1] who purchased

CenturyLink, Inc. stock between August 8, 2012 and February 13, 2013

("the Class Period).

Plaintiffs assert allegations of securities fraud pursuant to the

Private Securities Litigation Reform Act of 1995 ("PSLRA")[2] and

_____

[1] Specifically excluded from the class are the individual defendants, Glen F.
Post III, R. Stewart Ewing, Jr. and David D. Cole.

[2]    The PSLRA was passed to "provide uniform standards for class actions
and other suits alleging fraud in the securities market." Lander v. Hartford
Life & Annuity Ins., 251 F.3d 101 (2nd Cir.2001).  By passing this PSLRA,
Congress intended to prevent "strike suits".  See H.R. CONF. REP. NO. 105-803
(1998).  Strike suits are meritless class actions that allege fraud in the
purchase or sale of securities.  See Newby v. Enron Corp., 338 F.3d 467, 471
(5th Cir.2003) (describing strike suits as frivolous and meritless).  "Because

sections 10(b)[3] and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §78j(b) and 78r(a) and Rule 10(b)5 [4] promulgated by the Securities and Exchange Commission under the statute. See 17 C.F.R. 240.10b-5. Specifically, they contend CenturyLink falsely represented through press releases, conference calls, analyst conferences and SEC filings that it was financially capable of maintaining its credit rating and dividend payment. Plaintiffs claim they relied upon this information and CenturyLink's status as a "Dividend Aristocrat"[5] when they decided to purchase CenturyLink stocks.

Defendants contend the alleged misrepresentations are forward-looking statements and are immune from suit pursuant to the safe harbor provisions of the PSLRA, 15 U.S.C. §§77z-1, 78u. Defendants further argue that even if the statements are not protected by the safe harbor provisions, plaintiffs' complaint fails to meet the

---

of the expense of defending such suits, issuers were often forced to settle, regardless of the merits of the action. See H.R. CONF. REP. NO. 104-369 (1995). The PSLRA addressed these concerns by instituting, *inter alia*, heightened pleading requirements for class actions alleging fraud in the sale of national securities. See 15 U.S.C. §78u-4." Lander, 251 F.3d at 107.

[3] It is "unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange … [t]o use or employ, in connection with the purchase or sale of any security … any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors. 15 U.S.C. §78j.

[4] It is unlawful for anyone "(a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security. 17 C.F.R. §10b-5.

[5] According to plaintiffs' complaint, the term "Dividend Aristocrat" was coined by *Forbes* magazine and defined as "a company that has increased its dividend payouts for at least 25 consecutive years." (Doc. 39, p.9).

heighted pleading requirements of both Federal Rule of Civil Procedure 9(b) and section 10(b) of the Securities Exchange Act of 1934. Accordingly, the complaint should be dismissed pursuant to Fed.R.Civ.P. 12(b)(6).

The district judge referred the motion to me for report and recommendation and the parties thoroughly briefed the issues (Doc. 54, 55, 59 and 65). Thus, the matter is properly before me and ripe for consideration.

## Factual Allegations

According to the factual allegations set forth in the plaintiffs' "first amended securities action complaint" (Doc. 39)[6], CenturyLink began operations as a telephone landline provider. With the introduction of wireless service, CenturyLink found itself in a "dying industry"[7]. Accordingly, it spent the past decade acquiring smaller access line providers and regional telecommunications companies in an effort to build its business.

Among the companies acquired were: Embarq Corporation, a large independent local exchange carrier, purchased for $11.6 billion, Qwest Communications, a national telecommunications company, acquired through a stock transaction valued at $22.4 billion, and Savvis, "a provider of 'enterprise could computing' and related technology services"[8], purchased for $2.5 billion. In addition to acquiring the

---

[6] The court must consider as true and construe in a light most favorable to the plaintiffs the allegations set forth in the complaint  when considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).

[7] Doc.39, p. 10.

[8] Doc. 39, p. 3.

3

business of these companies, CenturyLink also acquired the outstanding
debt.[9]   Initially, this accumulation of debt was advantageous in that
CenturyLink could use the net operating losses ("NOLs") to offset its
gains.   However, the time during which these offsets could be claimed
was limited.

Despite the fact CenturyLink knew it would face a free cash-flow
crunch once the offsets expired, it continued to carry a great deal of
debt and assured investors it would be able to maintain its credit
rating and quarterly dividend of 72.5 cents per share or $2.90 per
share annually.   CenturyLink made these false representations via
press releases, conference calls, analyst conference and SEC filings
and misled investors into believing CenturyLink was financially
capable of maintaining or even increasing its dividend payment.   As a
result of the materially false and misleading statements,
CenturyLink's common stock traded at artificially inflated prices
during the class period.   That is, until CenturyLink made an
announcement on February 13, 2013.

CenturyLink's board of directors "authorized certain capital
allocation initiatives that further enabled its strategy of investing
in key drivers to stabilize and grow operating revenues."   (Doc. 39,
p.21-21).   Specifically, the board "authorized the repurchase of up to
an aggregate $2.0 billion of the company's outstanding common stock"
and intended "to revise the company's quarterly dividend rate to $0.54
from $0.725 per share."   (Id.)   Further, the board expected "to

---

[9] Embarq Corporation's outstanding debt was 5.8 billion, Qwest's was $11.8
billion and Savvis' totaled $700 million.

approve this new rate at its next regularly-scheduled meeting on February 26, 2013, with the change effective with the March 2013 quarterly dividend payment." (Id.). By cutting the dividend, CenturyLink projected a $500 million savings which would be coupled with free cash flows to allow for the repurchase of outstanding shares of stock.

As a result of the announcement, CenturyLink's stock price fell by 22% in the span of 24 hours.

<u>Legal Standard</u>

<u>Motion to Dismiss pursuant to 12(b)(6)</u>

To survive a motion to dismiss filed pursuant to Fed.R.Civ.P. 12(b)(6), the plaintiffs must plead enough facts to "state a claim to relief that is plausible on its face." <u>Ashcroft v. Iqbal</u>, 556 U.S. 622, 678 (2009)(quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u> All well pleaded facts shall be deemed as true and all reasonable inferences must be drawn in the plaintiffs' favor. <u>Lormand v. U.S. Unwired, Inc.</u>, 565 F.3d 228, 239 (5th Cir.2009). Nonetheless, a motion to dismiss filed pursuant the Fed.R.Civ.P. 12(b)(6) "is viewed with disfavor and rarely granted." <u>Kaiser Aluminum & Chem. Sales v. Avondale Shipyards</u>, 677 F.2d 1045, 1050 (5th Cir.1982).

When reviewing a motion to dismiss in a securities litigation matter, the court may consider the complaint, its proper attachments, documents incorporated into the complaint by reference and matters of

which the court may take judicial notice as well as the content of public disclosure documents filed with the SEC. See Randall v. Wolcott M.D., P.A. v. Sebelius, 635 F.3d 757, 763 (5th Cir.2011)(citation omitted). However, "these documents may be considered only for the purpose of determining what statements they contain and not for proving the truth of their content." Lovelace v. Software Spectrum, Inc., 78 F.3d 1015, 1018 & n.1 (5th Cir.1996).

Pleading Fraud Pursuant to Fed.R.Civ.P. Rule 9(b)

"In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge and other conditions of a person's mind may be alleged generally." Id. The Fifth Circuit Court of Appeals "interprets Rule 9(b) strictly, requiring a plaintiff [who pleads] fraud to specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." Dorsey v. Portfolio Equities, Inc., 540 F.3d 333, 339 (5th Cir.2008) (citations omitted).

Pleading Securities Fraud

Section 10(b) of the Securities Exchange Act provides the requirements for pleading securities fraud. It states, in relevant part:

> It shall be unlawful for any person, directly or indirectly…
>
> .   .   .
>
> To use or employ, in connection with the purchase or sale of any security … any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. §78j(b).  Additionally, Rule 10b-5 states, in pertinent part,

> It shall be unlawful for any person directly or indirectly…
>
> To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading…
>
> in connection with the purchase or sale of any security.

17 C.F.R. §240.10b-5.

Thus, a plaintiff alleging reliance upon a false or misleading statements or omissions as a basis for a securities fraud claim under §10(b) and Rule 10b-5 must: (1) specify each statement alleged to have been misleading; (2) identify the speaker; (3) state when and where the statement was made; (4) plead with particularity the contents of the false representations; (5) plead with particularity what the person making the misrepresentations obtained thereby; and (6) explain the reason or reasons why the statement is misleading. Goldstein v. MCI WorldCom, 340 F.3d 238, 245; Tellabs, Inc. v. Makor Issues and Rights, Ltd., 551 U.S. 308 (2007).  "This is the 'who, what, when, where and how' required under Rule9(b) in our securities fraud jurisprudence and under the PSLRA. Goldstein, 340 F.3d at 245 citing ABC Arbitrage Plaintiffs Group, 291 F.3d at 350.

Particularity Requirements of the PSLRA

The PSLRA also requires plaintiff to "plead (1) a misstatement or omission; (2) of a material fact; (3) made with scienter; (4) on which plaintiffs relied; and (5) that proximately caused the claimant's injuries." Southland Securities Corp. v. Inspire Ins. Solutions, 365

F.3d 353, 362 (5th Cir.2004); <u>Lovelace v. Software Spectrum, Inc.</u>, 78

F.3d 1015 (5th Cir.1996); <u>ABC Arbitrage Plaintiffs Group v. Tchuruk</u>,

291 F.3d 336, 348 (5th Cir.2002).[10]

> In any private action arising under this chapter in which
> the plaintiff alleges that the defendant—…
>
> omitted to state a material fact necessary in order to make
> the statements made, in the light of the circumstances in
> which they were made, not misleading…
>
> the complaint shall specify each statement alleged to have
> been misleading, the reason or reasons why the statement is
> misleading, and, if an allegation regarding the statement
> or omission is made on information and belief, the
> complaint shall state with particularity all facts on which
> that belief is formed.

15 U.S.C. §78u-4(b)(1).

"A fact is material if there is a 'substantial likelihood that,

under all the circumstances, the omitted fact would have assumed

actual significance in the deliberations of the reasonable

shareholder." <u>Southland</u>, 365 F.3d at 362 (quoting <u>Grigsby v. CMI</u>

<u>Corp.</u>, 765 F.2d 1369, 1373 (9th Cir. 1985) (quoting <u>TSC Industries,</u>

<u>Inc. v. Northway, Inc.</u>, 726 U.S. 438 (1976)).

Pleading Scienter

"The PSLRA pleading standard for scienter is especially

challenging for plaintiffs". <u>Plotkin v. IP Axess Inc.</u>, 407 F.3d 690,

696 (5th Cir.2005) (citing <u>Broad v. Rockwell Intern Corp.</u>, 642 F.2d

929, 961-62 (5th Cir.1981); <u>Nathenson v. Zonagen</u>, 967 F.3d 400, 407 (5th

Cir.2007)).  Scienter has been defined as "a mental state embracing

intent to deceive, manipulate or defraud" or recklessness that is

"limited to those highly unreasonable omissions or misrepresentations

---

[10] The requirements for a securities fraud actions are set forth in 15 U.S.C.A. §78u-4(b).

that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." Nathenson, 267 F.3d at 407 (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193-94 (1976) and Broad v. Rockwell Intern. Corp., 642 F.2d 929, 961-62 (5th Cir.1981)).

"[S]cienter must be pleaded with regard to 'each act or omission' sufficient to give 'rise to a strong inference that the defendant acted with the required state of mind.'" Southland Securities Corp., 365 F.3d at 364 (citing 15 U.S.C. §78u-4(b)). Courts must "look to the state of mind of the individual corporate official or officials 'who make or issue the statement or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like, rather than generally to the collective knowledge of all of the corporation's officers and employees acquired in the course of their employment.'" Flaherty v. Crumrine Preferred Income Fund, Inc. v. TXU Corp., 565 F.3d 200 (5th Cir.2009)(quoting Southland, 365 F.3d at 368).

Legal Analysis

Section 10(b) and Rule 10b-5 violation

Plaintiffs contend defendants made the following misrepresentations:

> (1) August 8, 2012, during a conference call with analysts and investors regarding CenturyLink's quarterly earnings, Ewing answered an analyst's question about what conversations CenturyLink had with the credit rating agencies regarding maintenance or stabilization of its credit ratings. Ewing stated Moody's was kept up to date

on a quarterly basis and it wanted to see CenturyLink "get down to 3 times debt to EBITDA based on their calculation and they're willing to give us some time to do that and they understand where we are" before removing the negative outlook.  As for Fitch, it focused on the dividend payout ratio which Fitch wanted around 55%.  Ewing indicated 55% was "in line with where we are.  And I think they're willing to potentially give us a little flexibility if we need to make other investments that they can see are strategic investments from the standpoint of driving revenue in the future or preserving revenue…." (Doc. 39, p.28)

(2)   August 9, 2012, CenturyLink filed its Form 10-Q for the quarter ending June 20, 2012.  The form, which was signed by Cole and certified by Ewing and Post, provided in relevant party, "[w]e currently expect to continue our current annual dividend of $2.90 per common share, subject to our board's discretion."  (Doc. 39, p.29).

(3)   September 13, 2012, during the Bank of America Merrill Lynch Media, Communications and Entertainment Conference Ewing commented on CenturyLink's ability to pay the same or higher quarterly dividend.  Specifically, he stated,

> I would say that a small increase in the dividend wouldn't be off the table that that would be something we consider and I think about and it's a, we understand and we have had more communication from shareholders.  I guess in the last six months, it seems to be moving and drifting toward the dividend increase model from the standpoint of driving potentially more value for shareholders that way.  That being said, I mean we are still pre-disposed from about to the-above of our stock and frankly, if we were to repurchase some of our shares, it actually helps us provide a little leeway per dividend increase potentially.

(4)   November 7, 2012, during a conference call held to discuss quarterly earnings, Ewing delivered a prepared statement in which he said, "we continue to believe a solid balance sheet is important to our financial flexibility and feel confident about our cash flow generating ability, which allows CenturyLink to return meaningful cash to our shareholders."  Post also spoke during the call and opined as to whether there was a higher value in companies that grew their dividend as opposed to companies that keep their dividend steady over time.   "It's something that we consider and we talk about our use of free cash flow basically every quarter and certainly every year.  We talk

in detail about what's the best way for us to drive long term shareholder value, and we realize that growing dividends is one way that companies have done that over time. So it is part of our consideration."

(5) November 8, 2012, CenturyLink filed its Form 10-Q, signed by Cole and certified by Post and Ewing, for the quarter ending September 30, 2012. In it, CenturyLink reported "[we] anticipate that our existing cash balances and net cash provided by operating activities will enable us to meet our other current obligations, fund capital expenditures and pay dividends to our shareholders. We also may draw on our revolving credit facility as a source of liquidity if and when necessary. … We currently expect to continue our current annual dividend of $2.90 per common share, subject to our board's discretion. See 'Risk Factors-Risks Affecting our Business' in item 1A of Part II of this report." (Doc. 39, p.31-32).

Additionally, it disclosed the fact a significant portion of the NOLs would be depleted by 2015 which would result in increased tax liability and payments. (Id.).

(6) February 13, 2013, during an earnings conference call with analysts and investors, Post admitted that as CenturyLink finalized its 2013 budget and worked with the rating agencies, it became aware of the fact that it would have to reduce investments in the business, growth that is investments and growth initiatives or reduce the dividend significantly and use 100% of the free cash flow to repay debt if it was to maintain investment ratings. Additionally, during a meeting following the announcement of the "capital allocation strategy" Post admitted to CenturyLink employees that he should have "prepped the market ahead of the dividend cut as opposed to announcing the cut".

As plaintiffs have sufficiently identified what misrepresentations were made, who made them and where and when they were made, the court must now determine whether plaintiffs sufficiently pled scienter.

Plaintiffs rely upon the defendants' positions as senior executives when pleading scienter.

86. By virtue of their positions at CenturyLink, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants

11

acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

87. Information showing that Defendants acted knowingly and with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of CenturyLink, the Individual Defendants had knowledge of the details of CenturyLink's internal affairs.

88. The Individual Defendants are liable for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of CenturyLink…

(Doc. 39, pp.44-45).

Though plaintiffs argue the 5th Circuit recently held in Spitzberg v. Houston American Energy Corporation, 758 F.3d 676 (5th Cir.2014) that plaintiff may use group pleading to establish scienter, a reading of Spitzberg shows that holding was limited to that defendant "due to the extremely small size of the company at issue." As CenturyLink is anything but a small corporation[11], the Southland holding, requiring courts to look to the individual's state of mind, still applies. Southland, 365 F.3d at 368. Thus, plaintiffs must either plead facts sufficient to show the individual defendant acted with the "intent to deceive, manipulate or defraud" or that he acted in a manner that was

---

[11] At the time of filing, CenturyLink was the third largest telecommunications company in the United States. It provided communications and data services to residential, business, governmental, and wholesale customers.

Case 3:13-cv-02318-EEF-JDK   Document 66   Filed 02/03/15   Page 13 of 17 PageID #:  870

so reckless that it constituted an extreme departure from ordinary care which presented a danger of misleading buyers or sellers.

At paragraph 86, plaintiffs allege:

> In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

While this is the only allegation regarding Cole's or Ewing's intent or recklessness, plaintiffs further allege that Post "confessed he should have 'prepped the market ahead of the dividend cut as opposed to announcing the cut'" on February 13, 2013 and engaged in insider trading.

Plaintiffs would like the court to infer from the "confession" that Post knew at the time he made the alleged misstatements[12] that CenturyLink would not pay the stated dividend of $2.90. However, the "confession" is nothing more than a comment made with the benefit of hindsight. Neither it nor any other allegation in the complaint indicates Post knew by November 8, 2012 that CenturyLink would cut its dividend and/or change its business strategy. If anything, the facts alleged indicate that the decision to cut the dividend was made at a time very near it being announced. The February 13, 2012 press release provides:

> In connection with the new purchase program, the board *also* indicated its *intention* to revise the company's quarterly

---

[12] Post is credited with three misrepresentations: two statements in quarterly reports to the SEC that CenturyLink expected to pay a dividend of $2.90, *subject to board approval* and the other being a response to an analysts question regarding whether he thought there was higher value in companies that grew their dividend ("We talk in detail about what's the best way for us to drive long term shareholder value, and we realize that growing dividends *is one way* that companies have done that over time. *So it is part of our consideration*."). (Doc. 39, p.29-32)(Emphasis added).

> **dividend rate** to $0.54 from $0.725 per share. The board
> **_expects to approve_ this new rate at its _next regularly-
> scheduled_ meeting on February 26, 2013**, with the change
> effective with the March 2013 quarterly dividend payment.

(Doc. 39, pp. 20-21). As of February 13, 2013 the Board simply expected to approve the cut to the dividend. Thus, it is more likely than not that the decision to cut the dividend was made in early 2013 and not on or before November 8, 2012 when Post made the three alleged misrepresentations regarding CenturyLink's expectations.

Plaintiff's would also like the court to infer Post's intent and/or recklessness based on the fact he sold 100,000 shares of CenturyLink stock on August 9, 2012. However, to use insider trading as evidence of scienter, plaintiffs must properly set forth the allegation and provide facts sufficient to suggest a strong inference of scienter.

While plaintiffs state Post sold 100,000 shares on the day CenturyLink stock hit a class period and yearly high of $43.43 per share and that the sale was unusual "when compared to [his] sales during the rest of 201[2]", they fail to allege what percentage of CenturyLink stock 100,000 shares constitutes or provide any other facts as to how that sale was unusual. (Doc. 39, p.18). Even taking this allegation as true, the Fifth Circuit has "recognized that 'appropriate allegations of motive and opportunity may meaningfully enhance the strength of the inference of scienter" with respect to insider trading "'only' when 'in suspicious amounts or at suspicious times." Southland Securities Corp., 365 F.3d at 368.

As plaintiffs fail to allege more than conclusory allegations of a single suspicious stock sale by Post, the allegation does not

14

support a strong inference of scienter.  Even when taking this allegation into consideration with others, a strong inference of scienter simply isn't found.

## Forward Looking Statements

Defendants contend that the aforementioned statements are all forward-looking statements[13] protected from ligation by PSLRA's "safe harbor" provisions.  15 U.S.C. §77z-2(c).  In light of the finding that plaintiffs have not set forth sufficient allegations of scienter, there is no need to address this argument.  Particularly because a person cannot be liable for forward looking statements made without actual knowledge that they were false or misleading.  15 U.S.C. §77z-2(c)(1)(B).  As plaintiffs have not properly pled scienter, there is no chance that they can prove, based on the allegations before the court, that the defendants had actual knowledge that their statements were false.[14]

## Section 20(a) violation

Defendants also seek dismissal of plaintiffs' claims against them under section 20(a) of the Securities Exchange Act of 1934 which provides:

---

[13] According to the PSLRA, "forward-looking" statements include those containing "a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items" and "future economic performance."  15 U.S.C. §78u-5(i)(1)(A)-(C).

[14]  Plaintiffs cited Lormand v. US Unwired, Inc., 565 F.3d 228 (5th Cir.2009) for the proposition that safe harbor provisions will not apply in cases where the plaintiff alleges the defendant has actual knowledge that the statements made were false.  However, a mere allegation of actual knowledge is insufficient to defeat the application of the safe harbor provision.  Plaintiffs must plead "adequate allegations" of the defendant's actual knowledge to prohibit the application of the PSLRA's safe harbor provisions.  Lormand, 565 F.3d at 244.

> Every person who, directly or indirectly, controls any
> person liable under any provision of this chapter . . .
> shall also be liable jointly and severally with and to the
> same extent as such controlled person…."

15 U.S.C. §78t(a). "Control person liability is secondary only and cannot exist in the absence of a primary violation." Southland Securities Corp., 365 F.3d at 383 (citing Lovelace, 78 F.3d at 1021 n.8). As there is no primary violation by any of the defendants, there cannot be any liability pursuant to section 20(a).

### Conclusion

Accordingly, **IT IS HEREBY RECOMMENDED** that the motion to dismiss (Doc. 54) be **GRANTED** and all claims set forth in the securities class action complaint be **DISMISSED WITH PREJUDICE.**

Under the provisions of 28 U.S.C. Section 636(b)(1)(C) and Rule 72(b), parties have fourteen (14) calendar days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. No other briefs (such as supplemental objections, reply briefs, etc.) may be filed. Providing a courtesy copy of the objection to the magistrate judge is neither required nor encouraged. Timely objections will be considered by the district judge before making a final ruling.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) CALENDAR DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT UPON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON**

APPEAL THE UN-OBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.

THUS DONE AND SIGNED at Alexandria, Louisiana on this 3rd day of February, 2015.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE